WRIGHT ET AL. *v.* CITY OF ROANOKE REDEVELOP-
MENT AND HOUSING AUTHORITY

No. 85–5915.   Argued October 6, 1986—Decided January 14, 1987

WHITE, J., delivered the opinion of the Court, in which BRENNAN, MAR-SHALL, BLACKMUN, and STEVENS, JJ., joined. O'CONNOR, J., filed a dissenting opinion, in which REHNQUIST, C. J., and POWELL and SCALIA, JJ., joined, *post*, p. 432.

*Henry L. Woodward* argued the cause for petitioners. With him on the briefs was *Renae Reed Patrick*.

*Bayard E. Harris* argued the cause and filed a brief for respondent.*

JUSTICE WHITE delivered the opinion of the Court.

Petitioners in this case, tenants living in low-income housing projects owned by respondent, brought suit under 42 U. S. C. § 1983,[1] alleging that respondent overbilled them for their utilities and thereby violated the rent ceiling imposed by the Brooke Amendment to the Housing Act of 1937, and the implementing regulations of the Department of Housing and Urban Development (HUD). The District Court, 605 F. Supp. 532 (WD Va. 1984), and the Court of Appeals for the Fourth Circuit, 771 F. 2d 833 (1985), concluded that petitioners did not have a cause of action under § 1983. We granted certiorari and now reverse.

I

Respondent is one of many public housing authorities (PHA's) established throughout the country under the United

---

*David B. Bryson* and *Catherine M. Bishop* filed a brief for the National Housing Law Project as *amicus curiae* urging reversal.

[1] "[42 U. S. C.] § 1983. Civil action for deprivation of rights:

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

States Housing Act of 1937, ch. 896, 50 Stat. 888, 42 U. S. C. § 1401 *et seq.*, (1970 ed.), to provide affordable housing for low-income people. In 1969, the Housing Act was amended in a fundamental respect: the Brooke Amendment, Pub. L. 91–152, § 213, 83 Stat. 389, imposed a ceiling for rents charged to low-income people living in public housing projects, and, as later amended, Pub. L. 97–35, § 322, 95 Stat. 400, provides that a low-income family "shall pay as rent" a specified percentage of its income.[2] HUD has consistently considered "rent" to include a reasonable amount for the use of utilities, which is defined by regulation as that amount equal to or less than an amount determined by the PHA to be a reasonable part of the rent paid by low-income tenants.[3]

---

[2] The Brooke Amendment in its present form reads as follows:

"§ 1437a. Rental payments

"(a) Families included; amount

"Dwelling units assisted under this chapter shall be rented only to families who are lower income families at the time of their initial occupancy of such units. Reviews of family income shall be made at least annually. A family shall pay as rent for a dwelling unit assisted under this chapter (other than a family assisted under section 1437f(o) of this title) the highest of the following amounts, rounded to the nearest dollar:

"(1) 30 per centum of the family's monthly adjusted income;

"(2) 10 per centum of the family's monthly income; or

"(3) if the family is receiving payments for welfare assistance from a public agency and a part of such payments, adjusted in accordance with the family's actual housing costs, is specifically designated by such agency to meet the family's housing costs, the portion of such payments which is so designated." 42 U. S. C. § 1437a (1982 ed. and Supp. III).

The language of the original Brooke Amendment required that low-income tenant's rent "may not exceed one-fourth of the family's income, as defined by the Secretary."

[3] The complaint was filed December 8, 1982. The regulations in effect at that time defined "contract rent," that is, the amount actually charged to low-income tenants, as follows:

"Contract rent means the rent charged a tenant for the use of the dwelling accommodation and equipment (such as ranges and refrigerators but not including furniture), services, and reasonable amounts of utilities de-

In their suit against respondent, petitioners alleged that respondent had overcharged them for their utilities by failing to comply with the applicable HUD regulations in establishing the amount of utility service to which petitioners were entitled. Thus, according to petitioners, respondent imposed a surcharge for "excess" utility consumption that should have been part of petitioners' rent[4] and deprived them of their

termined in accordance with the PHA's [public housing authority's] schedule of allowances for utilities supplied by the project. Contract rent does not include charges for utility consumption in excess of the public housing agency's schedule of allowances for utility consumption, or other miscellaneous charges . . . ." 24 CFR § 860.403 (1982).

The relevant regulations were originally promulgated as an interim rule on September 9, 1980. 45 Fed. Reg. 59502 (1980). As there noted, HUD had previously regulated the way in which utility charges were dealt with in HUD's Local Housing Authority Management Handbook, pt. 2, § 9, Controlling Utility Consumption and Costs (1963). *Ibid.* On August 13, 1982, HUD published a proposed rule to amend the interim regulations, commenting as follows with respect to the inclusion of utilities in the calculation of rent:

"In administering the low-income public housing program under the United States Housing Act of 1937, as amended, HUD historically has considered 'rent' to include shelter cost plus a reasonable amount for utilities. As a result, even prior to adoption of the 'Brooke Amendment' in 1969 (limiting the amount of 'rent' chargeable to public housing tenants to a stated percentage of income, then 25 percent), HUD provided for a system under which allowances were established as part of the rent schedule showing the amounts of electricity in kilowatt-hours to which tenants were entitled." 47 Fed. Reg. 35249–35250 (1982).

The regulation was finally amended on August 7, 1984. 49 Fed. Reg. 31399 (1984). The Supplementary Information section of the published regulation contains a discussion which underscores the fact that HUD has traditionally treated "rent" to include a reasonable amount of utility usage. *Id.*, at 31400. That section also provides an overview of the development of the utility regulations at issue here.

The dissent may have a different view, but to us it is clear that the regulations gave low-income tenants an enforceable right to a reasonable utility allowance and that the regulations were fully authorized by the statute.

[4] The applicable regulations, 24 CFR § 865.470 *et seq.* (1983), require housing authorities like respondent to, *inter alia*, recalculate their utility allowances on the basis of current data, to set the allowances in such a fash-

statutory right to pay only the prescribed maximum portion of their income as rent.[5]   The District Court granted summary judgment for respondent on petitioners' § 1983 claim, holding that a private cause of action was unavailable to enforce the Brooke Amendment.   The Court of Appeals for the Fourth Circuit affirmed.   Relying primarily on two of its earlier decisions, *Perry* v. *Housing Authority of Charleston*, 664 F. 2d 1210 (1981), and *Phelps* v. *Housing Authority of Woodruff*, 742 F. 2d 816 (1984), the Court of Appeals held that while the Brooke Amendment confers certain rights on tenants, these rights are enforceable only by HUD, not by the individual tenant: "[T]he situation is very analogous to the one in which a trustee [that is, HUD], not the *cestui que trust*, must bring suit."   771 F. 2d, at 836.[6]

---

ion that 90 percent of a particular authority's dwelling units do not pay surcharges, and to review tenant surcharges quarterly and consider revision of the allowances if more than 25 percent of any category of units are being surcharged.

[5] The complaint also contained a claim against respondent for breach of paragraph 4 of the standard lease agreement providing:

"Utilities: Management Agent agrees to furnish at no charge to the Resident the following utilities as reasonably necessary: hot and cold water, gas for cooking, and electricity for lighting and general household appliances and heat at appropriate times of the year, and also range and refrigerator. Resident will be required to pay for all excess consumption of utilities above the monthly allocated amount as developed by the Authority and determined by the individual check meter servicing the leased unit.   The schedule of allocations and charges for excess consumption is posted on the bulletin board of each Housing Development office."   Record, Exh. H.

The original complaint asked for both injunctive relief and recovery of whatever amount respondent allegedly overcharged petitioners.   Pursuant to new HUD regulations, respondent revised its allowances for reasonable utility use.   Petitioners are now seeking only recovery of alleged past improper charges.   Brief for Petitioners 8.

Petitioners asserted that while their right to sue on the lease derives from state law, the lease claim is controlled by federal law and hence is within the jurisdiction of the federal courts under 28 U. S. C. § 1331.

[6] The court acknowledged that its conclusion that the Brooke Amendment created no enforceable rights in petitioners conflicted with the Sec-

## II

*Maine* v. *Thiboutot*, 448 U. S. 1 (1980), held that § 1983 was available to enforce violations of federal statutes by agents of the State. *Pennhurst State School and Hospital* v. *Halderman*, 451 U. S. 1 (1981), and *Middlesex County Sewerage Authority* v. *National Sea Clammers Assn.*, 453 U. S. 1 (1981), however, recognized two exceptions to the application of § 1983 to remedy statutory violations: where Congress has foreclosed such enforcement of the statute in the enactment itself and where the statute did not create enforceable rights, privileges, or immunities within the meaning of § 1983. In *Pennhurst*, a § 1983 action did not lie because the statutory provisions were thought to be only statements of "findings" indicating no more than a congressional preference—at most a "nudge in the preferred directio[n]," 451 U. S., at 19, and not intended to rise to the level of an enforceable right. In *Sea Clammers*, an intent to foreclose resort to § 1983 was found in the comprehensive remedial scheme provided by Congress, a scheme that itself provided for private actions and left no room for additional private remedies under § 1983. Similarly, *Smith* v. *Robinson*, 468 U. S. 992, 1012 (1984), held that allowing a plaintiff to circumvent the Education of the Handicapped Act's administrative remedies would be inconsistent with Congress' carefully tailored scheme, which itself allowed private parties to seek remedies for violating federal law. Under these cases, if there is a state deprivation of a "right" secured by a federal statute, § 1983 provides a remedial cause of action unless the state actor demonstrates by express provision or other specific evidence from the statute itself that Congress intended to foreclose such private enforcement. "We do not lightly

ond Circuit's decision in *Beckham* v. *New York City Housing Authority*, 755 F. 2d 1074 (1985). The court stated, however, that this decision "must yield to the authority of *Perry* and *Phelps*, *supra*, from our own circuit." 771 F. 2d, at 837, n. 8.

conclude that Congress intended to preclude reliance on § 1983 as a remedy" for the deprivation of a federally secured right. *Ibid.*

Here, the Court of Appeals held that the statute and the Brooke Amendment clearly manifested congressional intention to vest in HUD the exclusive power to enforce the benefits due housing project tenants and hence the intention to foreclose both a private cause of action under the Housing Act and any private enforcement under § 1983. For the Court of Appeals, the barrier was not the lack of statutory right or its quality or enforceability—"the plaintiffs under 42 U. S. C. § 1437a have certain rights," 771 F. 2d, at 837—but the fact that Congress had not intended tenants to have the authority themselves to sue: "HUD alone may, as quasi trustee, take legal action, for the right is explicitly tailored not to allow the beneficiaries, the low cost housing tenants, to do so." *Ibid.*

We disagree with the Court of Appeals' rather summary conclusion that the administrative scheme of enforcement foreclosed private enforcement. The Court of Appeals merely relied on one of its prior cases which had referred to HUD's authority to enforce the annual contributions contracts between PHA's and HUD, see 42 U. S. C. § 1437c, to conduct audits and to cut off funds. HUD undoubtedly has considerable authority to oversee the operation of the PHA's. We are unconvinced, however, that respondent has overcome its burden of showing that "the remedial devices provided in [the Housing Act] are sufficiently comprehensive . . . to demonstrate congressional intent to preclude the remedy of suits under § 1983." *Sea Clammers, supra,* at 20. They do not show that "Congress specifically foreclosed a remedy under § 1983." *Smith* v. *Robinson, supra,* at 1004–1005, n. 9. Not only are the Brooke Amendment and its legislative history devoid of any express indication that exclusive enforcement authority was vested in HUD, but there have also been both congressional and agency actions indicating that

enforcement authority is not centralized and that private actions were anticipated. Neither, in our view, are the remedial mechanisms provided sufficiently comprehensive and effective to raise a clear inference that Congress intended to foreclose a § 1983 cause of action for the enforcement of tenants' rights secured by federal law.

In 1981, Congress changed the maximum percentage of income that could be paid as "rent" from 25 percent to 30 percent. Omnibus Budget Reconciliation Act of 1981, Pub. L. 97–35, § 322, 95 Stat. 400. In making this change, Congress gave the Secretary of HUD discretion to raise tenants' rent incrementally over a 5-year period to ease the burden on low-income tenants during the transition. § 322(i), 95 Stat. 404. To avoid a potential multitude of litigation over the way in which the Secretary implemented the phased-in rate increase, Congress specifically made the Secretary's decisions effectuating the phase-in immune from judicial review. § 322(i)(3). At congressional hearings in which this specific and limited exception to judicial review was discussed, HUD representatives explained that this exception had no effect on tenants' ability to enforce their rights under the Housing Act in federal court other than the limited exception concerning the phase-in.[7] Apparently dissatisfied with even a tempo-

---

[7] In response to a question by Congressman Vento concerning the reason for the exception to judicial review, a representative of HUD explained that this limited exception had no effect on tenants' ability to protect their rights other than limiting their right to challenge the Secretary's actions in implementing the phase-in:

"MR. VENTO. Well, has this been a special problem? Usually we don't exempt people from going to the district court unless there has been some problem that has developed. Has there been that type of a problem in the past?

"MR. HOVDE. I will call upon Mr. Hipps for a response.

"MR. HIPPS. In direct answer to your question, yes, we have had a lot of litigation involving tenants rights over the past several years. The provision that you have raised a question about is addressed only at the 5-year phase in of the increase, and is not intended, as I understand, to eliminate any tenants rights beyond that point." Hearings on Housing and Commu-

rary preclusion of judicial review, Congress repealed it two years later. Pub. L. 98–181, § 206(e), 97 Stat. 1181.

Also at odds with the holding that HUD has exclusive authority to enforce the Brooke Amendment is the enactment in 1985 of 42 U. S. C. § 1437d(k) (1982 ed., Supp. III), which directed HUD to continue its longstanding regulatory requirement that each PHA provide formal grievance procedures for the resolution of tenant disputes with the PHA arising out of their lease or PHA regulations. These procedures, which Congress ordered continued, include informal and formal hearings and administrative appeals, conducted within each PHA by impartial decisionmakers, to consider adverse decisions taken against tenants by the PHA. Congress' aim was to provide a "decentralized, informal, and relatively non-adversarial administrative process" for resolving tenant-management disputes. *Samuels* v. *District of Columbia,* 248 U. S. App. D. C. 128, 133, 770 F. 2d 184, 189 (1985). The procedures are open to individual grievances but not to class actions. See 24 CFR § 966.51(b) (1986). HUD itself has never provided a procedure by which tenants could complain to it about the alleged failures of PHA's to abide by their annual contribution contracts, the Brooke Amendment, or HUD regulations; nor has it taken unto itself the task of reviewing PHA grievance procedure decisions. Moreover, § 966.57(c) of HUD's grievance procedure regulations provides that a decision terminating a grievance proceeding shall in no way affect the rights of a tenant either to seek "trial *de novo* or judicial review in any judicial proceedings, which may thereafter be brought in the matter." HUD thus had no thought that its own supervisory powers or the grievance system that it had established foreclosed resort to the courts by tenants who claimed that a PHA was not observing the commands of the Brooke Amendment.

---

nity Development Amendments before the Subcommittee on Housing and Community Development of the House Committee on Banking, Finance and Urban Affairs, 97th Cong., 1st Sess., pt. 1, p. 654 (1981).

There is other evidence clearly indicating that in HUD's view tenants have the right to bring suit in federal court to challenge housing authorities' calculations of utility allowances. Among HUD's 1982 proposed regulations was § 865.476(d), 47 Fed. Reg. 35249, 35254 (1982), which would have confined tenant utility-allowance challenges to the procedures available in state court. The final regulation, however, contained no such limitation and contemplated that tenants could challenge PHA actions in federal as well as state courts. 24 CFR § 965.473(e) (1985). As the comment accompanying the final regulation explained, the proposal to limit challenges to state-court actions had been abandoned. The final "provision does not preclude Federal court review." 49 Fed. Reg. 31403 (1984). HUD's opinion as to available tenant remedies under the Housing Act is entitled to some deference by this Court. See *Jean* v. *Nelson*, 472 U. S. 846, 865 (1985); *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837, 844 (1984).

In both *Sea Clammers* and *Smith* v. *Robinson*, the statutes at issue themselves provided for private judicial remedies, thereby evidencing congressional intent to supplant the § 1983 remedy. There is nothing of that kind found in the Brooke Amendment or elsewhere in the Housing Act. Indeed, the only private remedy provided for is the local grievance procedures which the Act now requires. These procedures are not open to class grievances; and even if tenants may grieve about a PHA's utility allowance schedule, which petitioners dispute,[8] the existence of a state adminis-

---

[8] Petitioners assert that the grievance mechanism is not available for challenges to the general utility allowance schedules. They rely on HUD statements to this effect, the first in 1984 in connection with the issuance of formal regulations, 49 Fed. Reg. 31407:

"Some legal services organizations recommended that grievance procedures should apply to the utility allowance provisions. Grievance procedures under former Part 866 (now Part 966) apply to individual, not class, grievances so that challenges to the general utility allowance schedules would be precluded. The Department believes that procedures to be fol-

trative remedy does not ordinarily foreclose resort to § 1983. See *Patsy* v. *Board of Regents of Florida*, 457 U. S. 496, 516 (1982).

The Court of Appeals and respondents rely on HUD's authority to audit, enforce annual contributions contracts, and cut off federal funds. But these generalized powers are insufficient to indicate a congressional intention to foreclose § 1983 remedies. Cf. *Cannon* v. *University of Chicago*, 441 U. S. 677, 704–707 (1979); *Rosado* v. *Wyman*, 397 U. S. 397, 420 (1970). HUD has the authority to audit, but it does not do so frequently and its own Handbook requires audits only every eight years.[9] There are no other mechanisms provided to enable HUD to effectively oversee the performance of the some 3,000 local PHA's across the country. The statute does not require and HUD has not provided any formal procedure for tenants to bring to HUD's attention alleged PHA failures to abide by the Brooke Amendment and HUD regulations. Hence, there will be little occasion to exercise HUD's power to sue PHA's to enforce the provisions of the

---

lowed on claims for individual relief under § 965.479 should be left to PHA determination."

The second statement by HUD was in connection with proposing new grievance hearing regulations in 1986, 51 Fed. Reg. 26528:

"(a) *Purpose of informal hearing.* (1) The grievance procedure shall provide the Family an opportunity for an informal hearing to review proposed PHA adverse action. The purpose of the informal hearing shall be to review whether the proposed adverse action by the PHA is in accordance with the lease, or with the law, HUD regulations or PHA rules.

"(2) PHA action or non-action concerning general policy issues or class grievances (including determination of the PHA's schedules of allowances for PHA-furnished utilities or of allowances for Tenant-purchased utilities) does not constitute adverse action by the PHA, and the PHA is not required to provide the opportunity for a hearing to consider such issues or grievances."

[9] United States Dept. of Housing and Urban Development, Field Office Monitoring of Public Housing Agencies (PHAs) 6–1 (Handbook 7460.7, Rev. Sept. 9, 1985).

annual contributions contracts. Respondent asserts PHA's must annually file their utility allowance schedules with HUD and that HUD must approve them, but the final regulations eliminated HUD's duty to approve these schedules before their effective date. 24 CFR § 965.473(d) (1986). Review of the schedules would be done in the course of audits or reviews of PHA operations.[10]

Lastly, it is said that tenants may sue on their lease in state courts and enforce their Brooke Amendment rights in that litigation. Perhaps they could, but the state-court remedy is hardly a reason to bar an action under § 1983, which was adopted to provide a federal remedy for the enforcement of federal rights.

In sum, we conclude that nothing in the Housing Act or the Brooke Amendment evidences that Congress intended to preclude petitioners' § 1983 claim against respondent.

### III

Although the Court of Appeals read the Brooke Amendment as extending to housing project tenants certain rights enforceable only by HUD, respondent asserts that neither the Brooke Amendment nor the interim regulations gave the

---

[10] HUD explained, 49 Fed. Reg. 31403 (1984), as follows:

"In a related issue, legal service organizations expressed concern about the absence of any HUD review of the PHA's allowance determination.

"HUD's regulatory reform goals include the removal of unnecessary reviews and approvals of actions by responsible parties having equal or greater information at hand. This is particularly appropriate in the case of public housing in view of the '37 Act's injunction that '[I]t is the policy of the United States to vest in the local public housing agencies the maximum amount of responsibility in the administration of their housing programs.' 42 U. S. C. 1437. The Department believes that the definition of standards in § 965.476, combined with the record and notice provisions added to § 965.473, should adequately assure the reasonableness of PHA determinations so as to obviate the necessity or usefulness of HUD review and approval before implementation of PHA-determined allowances."

tenants any specific or definable rights to utilities, that is, no enforceable rights within the meaning of § 1983. We perceive little substance in this claim. The Brooke Amendment could not be clearer: as further amended in 1981, tenants could be charged as rent no more and no less than 30 percent of their income. This was a mandatory limitation focusing on the individual family and its income. The intent to benefit tenants is undeniable. Nor is there any question that HUD interim regulations, in effect when this suit began, expressly required that a "reasonable" amount for utilities be included in rent that a PHA was allowed to charge, an interpretation to which HUD has adhered both before and after the adoption of the Brooke Amendment. HUD's view is entitled to deference as a valid interpretation of the statute, and Congress in the course of amending that provision has not disagreed with it.[11]

---

[11] We thus reject respondent's argument that the Brooke Amendment's rent ceiling applies only to the charge for shelter and that the HUD definition of rent as including a reasonable charge for utilities is not authorized by the statute.

The dissent misconstrues our discussion of the Omnibus Budget Reconciliation Act of 1981 and the enactment of the grievance procedures as codified at 42 U. S. C. § 1437d(k) (1982 ed., Supp. III). Our conclusion that low-income tenants have a right to a reasonable amount of utilities does not come from these two congressional Acts. Rather, these Acts and their history show that Congress did not close the courthouse door to low-income tenants by establishing an alternative enforcement mechanism.

The dissent is also quite wrong in concluding that HUD's "regulations indicate that while it did not have the authority finally to resolve the question, HUD viewed utilities determinations as a matter for state rather than federal courts." *Post*, at 440. It is true that the 1982 proposed regulations would have confined review of PHA utility allowances to state forums, but it was never indicated that the governing law was state rather than federal law; and in the final regulations, even the provision making PHA determinations final unless overturned in state courts was deleted. HUD thus abandoned any attempt to foreclose resort to federal courts and surely negated any conclusion that PHA determinations were not judicially reviewable. The Supplemental Information section to HUD's final regula-

Respondent nevertheless asserts that the provision for a "reasonable" allowance for utilities is too vague and amorphous to confer on tenants an enforceable "right" within the meaning of § 1983 and that the whole matter of utility allowances must be left to the discretion of the PHA, subject to supervision by HUD. The regulations, however, defining the statutory concept of "rent" as including utilities, have the force of law, *Chrysler Corp.* v. *Brown,* 441 U. S. 281, 294–295 (1979), they specifically set out guidelines that the PHAs

tions contains the following revealing discussion, 49 Fed. Reg. 31403 (1984):

"*C. Review of PHA Decisions by State Courts*

"The National Housing Law Project and other legal service groups challenged, as illegal, proposed § 865.476(d) which would make PHA determinations of allowances and revisions thereof final unless found, upon review pursuant to such procedures as may be available under State or local law, to be arbitrary or capricious.

"The commenters challenged HUD's power .(1) to prescribe a standard of review for State courts, and (2) to divest Federal court of jurisdiction over cases involving questions of compliance with Federal statutes and regulations.

"State procedures for review of actions by administrative bodies created under State law frequently have provided a forum for review of agency determinations that involve questions of Federal law. Such State law proceedings may be more accessible to public housing tenants in some localities than a Federal court. Moreover, the Department believes that State courts are fully competent to review determinations by authorities created under State law.

"Nevertheless, the Department also recognizes that some plaintiffs may prefer to challenge PHA determinations in Federal rather than State court and that the Department's power to preclude access to Federal court is doubtful. The Department also recognizes that not all States may have adopted procedures providing for judicial review of administrative action. Accordingly, this provision (transferred to § 965.473(e)) has been revised (i) to expand the standard of review to 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law' (compare Section 706 of the Administrative Procedure Act, 5 U. S. C. 706(2)), and (ii) to state that such standard of review will govern 'except where a different standard of review is applicable in review procedures governed by applicable State law.' This provision does not preclude Federal court review."

were to follow in establishing utility allowances, and they require notice to tenants and an opportunity to comment on proposed allowances. In our view, the benefits Congress intended to confer on tenants are sufficiently specific and definite to qualify as enforceable rights under *Pennhurst* and § 1983, rights that are not, as respondent suggests, beyond the competence of the judiciary to enforce.[12]

The judgment of the Court of Appeals is accordingly

*Reversed.*

JUSTICE O'CONNOR, with whom THE CHIEF JUSTICE, JUSTICE POWELL, and JUSTICE SCALIA join, dissenting.

As the Court's opinion acknowledges, there must be a deprivation "of a 'right' secured by a federal statute" before 42 U. S. C. § 1983 provides a remedial cause of action. *Ante*, at 423. Petitioners' claim of a federally enforceable "right" raises three distinct questions. The first question is whether the Brooke Amendment to the Public Housing Act of 1937, Pub. L. 91–152, § 213, 83 Stat. 389 (1969), itself has created an enforceable right to utilities. The second is whether, in the absence of any indication of congressional intent to create a right to utilities, administrative regulations can create such a right. The third is whether, assuming administrative regulations alone could create a right enforceable in a § 1983 action, the regulations at issue in this case have established standards capable of judicial interpretation and application.

Whether a federal statute confers substantive rights is not an issue unique to § 1983 actions. In implied right of action

---

[12] Petitioners also argue that the District Court has subject-matter jurisdiction to consider their breach-of-lease claims given the federal nature of the rights contained in their leases. In light of our decision that petitioners have a § 1983 claim, the District Court can certainly exercise pendent jurisdiction over petitioners' breach-of-lease claims. We offer no opinion as to whether the District Court has jurisdiction to consider only their breach-of-lease claims irrespective of their § 1983 claim.

cases, the Court also has asked, since *Cort* v. *Ash*, 422 U. S. 66, 78 (1975), whether "the statute create[s] a federal right in favor of the plaintiff." In determining whether a statute creates enforceable rights, the "key to the inquiry is the intent of the Legislature." *Middlesex County Sewerage Authority* v. *National Sea Clammers Assn.*, 453 U. S. 1, 13 (1981). We have looked first to the statutory language, to determine whether it is "phrased in terms of the persons benefited," *Cannon* v. *University of Chicago*, 441 U. S. 677, 692, n. 13 (1979), and is cast in mandatory rather than precatory terms. See *Pennhurst State School and Hospital* v. *Halderman*, 451 U. S. 1, 18 (1981). We then have reviewed the legislative history of the statute and other traditional aids of statutory interpretation to determine congressional intent to create enforceable rights. See *Sea Clammers, supra,* at 13.

Petitioners in this case assert that the Brooke Amendment creates an enforceable right to have "reasonable utilities" included in the limitation on the "rent" they may be charged by a public housing authority (PHA). The Brooke Amendment, as amended, Pub. L. 97–35, § 322, 95 Stat. 400, provides that a low-income family "shall pay as rent" a specified percentage of its monthly income for publicly assisted housing. The Court concludes that the statute's language satisfies the standards we have used in ascertaining an intent to create substantive rights: it is phrased in mandatory and not merely precatory terms, and it places an unmistakable focus on the benefited class. *Ante*, at 430. The statute also is phrased using right-creating language rather than being framed "simply as a general prohibition or a command to a federal agency." *University Research Assn.* v. *Coutu*, 450 U. S. 754, 772 (1981).

Assuming, as the Court finds, that Congress intended to create an enforceable right to a limitation on the amount PHA's may charge "as rent," the question remains whether petitioners' claim to reasonable utilities comes within the

scope of the right that Congress intended to confer. On the face of the statute, there is nothing to suggest that Congress intended that utilities be included within the statutory entitlement. "Rent" in ordinary usage simply means consideration paid for the use or occupation of property, and the statute does not suggest congressional intent to adopt a broader construction of the term.

The legislative history of the Brooke Amendment, far from indicating an intent to create a statutory right to utilities, shows that Congress was presented with, and ultimately rejected, a proposal to create an enforceable right to "reasonable utilities." As originally reported out of the Senate, Senator Brooke's bill enumerated a range of shelter costs in addition to "rent" that were to be subject to the statutory rent limit. The Senate bill provided that the term "rental" was to include "the proportionate share attributable to the unit of the total shelter costs to be borne by the tenants in a low-rent housing project, *including any separate charges to a tenant for reasonable utility use and for public services and facilities.*" 115 Cong. Rec. 26726 (1969) (emphasis added). In the bill reported out of Conference, however, this reference to utilities was deleted. The Conference Report stated that the substitute bill "retain[ed] the basic concept" of the Senate bill by "generally limiting rents that may be charged to no more than 25% of [the tenant's] income," but it included no reference to the utilities charges provided for in the Senate bill. See H. R. Conf. Rep. No. 91–740, p. 30 (1969). In adopting the Brooke Amendment, therefore, Congress deliberately refrained from including "charges to a tenant for reasonable utility use and for public services and facilities" within the statutory entitlement.

The Court does not find that the statute's language or legislative history supports its conclusion that Congress intended to create a statutory entitlement to reasonable utilities. Instead, the Court concludes that the Department of Housing and Urban Development (HUD) has so interpreted

the statute, and that "HUD's view is entitled to deference as a valid interpretation" of the Brooke Amendment. *Ante,* at 430. In my view, HUD's treatment of utilities since enactment of the Brooke Amendment will not bear the construction that the Court places upon it. Before passage of the Brooke Amendment, HUD's Local Housing Authority Management Handbook, pt. 2, § 9, Controlling Utility Consumption and Costs (1963), which provided guidelines for PHA's to use in calculating utility allowances, had established "no mandatory Federal standards, leaving the establishment of Allowances entirely to local discretion." 45 Fed. Reg. 59502 (1980). After enactment of the Brooke Amendment, HUD did not immediately promulgate new regulations fixing the amount of utilities that should be provided under the statute. Instead, the Handbook remained in effect for the next 11 years, until 1980, with the PHA's retaining complete discretion in the establishment of utilities allowances. Thus, HUD viewed the amount of utilities to be included under the Brooke Amendment's rental limitation as a question for local housing authorities—it was not a matter of federal entitlement.

The 1980 interim regulations on which petitioners rely do not reflect a different understanding on the part of the agency.[1] The reason given for adopting a uniform federal

---

[1] The interim regulations provided:

"§ 865.477. Standards for allowances for PHA-furnished utilities.

"The Allowances for PHA-Furnished Utilities for each dwelling unit category and unit size shall be established in terms of consumption units, sufficient to meet the requirements of about 90% of the dwelling units in the category. Conversely, the Allowances should be such as are likely to result in surcharges for about 10% of the dwelling units. The basic method of determining the Allowances should be as follows:

"(a) The dwelling unit consumption data for all units within each dwelling unit category and unit size should be listed in order from low to high consumption for each billing period.

"(b) The PHA should determine whether there are any unusually high instances of consumption which might be due to unusual individual circum-

436

rule was administrative: it would be in "the best interests of the program" because it would "alleviate confusion and controversy" arising under the nonmandatory regime. 45 Fed. Reg. 59502 (1980). Noting that "many PHAs have been establishing utility allowances based on the HUD Guide," the agency sought to develop a uniform standard following "the general concepts" of the 1963 Handbook. *Ibid.* However, the uniform standards promulgated in the interim regulations came under severe criticism, see 47 Fed. Reg. 35249, 35250 (1982), and, less than two years after adoption of the interim regulations, HUD enacted proposed regulations designed to return "broad administrative latitude" to the PHA's in setting utility allowances. See *id.*, at 35252. The proposed regulations retained a general standard of "reasonable consumption of utilities by an energy-conservative household of modest circumstances consistent with the requirements of a safe, sanitary, and healthful living environment." *Id.*, at 35251. In light of HUD's experience with the interim regulations, however, HUD deemed it "inadvisable" to "attempt to prescribe more restrictively the means by which individual PHAs must realize the general standards for allowances described above." *Id.*, at 35251–35252. HUD also indicated that the mandatory standards in the interim regulations may have been "inconsistent with the general imperative of the United States Housing Act of 1937, to 'vest in local public housing agencies the maximum amount of responsibility in

stances, wasteful practices, or use of the Utility for tenant-supplied major appliances. The PHA should exclude such cases from consideration in calculating the amount of the allowance.

"(c) Where the available data covers two or more years, averages should be computed and adjustments made, if warranted, by reason of abnormal weather conditions or other changes in circumstances affecting utility consumption.

"(d) The Allowances should then be established at the level which can reasonably be expected to meet the requirements of 90% of the dwelling units in the category." 24 CFR § 865.477 (1981).

the administration of their housing program.'" *Id.*, at 35252.

In 1984, HUD enacted its final utilities regulations, which follow the approach of the proposed regulations and replace the more specific requirements of the interim regulations with a "reasonable utilities" standard. In establishing allowances, PHA's should consider a host of factors such as climatic location; air temperature to be maintained in the dwelling unit; the temperature of domestic hot water measured at the tap; and the physical condition of the housing project. See 24 CFR § 965.476(d) (1986). Apart from these general guidelines, the regulations "ves[t] full responsibility for setting and revising allowances in accordance with the prescribed standards in the [PHA's]." 49 Fed. Reg. 31399, 31400 (1984). Thus, HUD currently chooses to give the PHA's wide discretion in setting utilities allowances; from 1980–1984, it gave the PHA's somewhat less discretion; and from 1969–1980, it left the issue entirely in the hands of the PHA's. The reasons HUD has given for these changes are ministerial, not interpretive. HUD's treatment of utilities since enactment of the Brooke Amendment shows that the agency does *not* view the statute as creating an enforceable right to an ascertainable amount of utilities: the degree to which utilities are fixed by regulation has been a matter of agency discretion, not statutory entitlement.

In the absence of any indication in the language, legislative history, or administrative interpretation of the Brooke Amendment that Congress intended to create an enforceable right to utilities, it is necessary to ask whether administrative regulations *alone* could create such a right. This is a troubling issue not briefed by the parties, and I do not attempt to resolve it here. The Court's questionable reasoning that, because for four years HUD gave somewhat less discretion to the PHA's in setting reasonable utilities allowances, HUD understood Congress to have *required* enforceable utility standards, apparently allows it to sidestep the

question. I am concerned, however, that lurking behind the Court's analysis may be the view that, once it has been found that a statute creates some enforceable right, *any* regulation adopted within the purview of the statute creates rights enforceable in federal courts, regardless of whether Congress or the promulgating agency ever contemplated such a result. Thus, HUD's frequently changing views on how best to administer the provision of utilities to public housing tenants becomes the focal point for the creation and extinguishment of federal "rights." Such a result, where determination of § 1983 "rights" has been unleashed from any connection to congressional intent, is troubling indeed.

Even assuming that agency regulations of the sort at issue here could create rights enforceable in a § 1983 action, the temporary regulations involved in this case are not capable of judicial enforcement. The provisions remained subject to the exercise of wide discretion by the local housing authorities, thereby rendering it difficult or impossible to determine whether a violation occurred. Moreover, the regulations were cast as overall standards rather than as a method for determining the utilities rates for particular tenants, making it impossible to fashion appropriate relief for individual plaintiffs. Thus, under the interim regulations PHAs were to establish allowances which could "reasonably be expected" to meet the requirements of "about 90%" of the dwelling units in a particular "dwelling unit category." In making this calculation, the housing authorities were to exclude from consideration cases of "unusual individual circumstances," "wasteful practices," or use of major appliances. Adjustments also could be made, "if warranted," for "abnormal weather conditions or other changes in circumstances affecting utility consumption." See 24 CFR § 865.477 (1981). The housing authorities were to revise their utility allowances if more than 25% of the tenants in a particular dwelling unit category were being surcharged, if there was "no reason of a non-recurring nature (such as weather extremes) to account for this" and if

it was otherwise "appropriate." § 865.480(b). Provisions such as these, which provide no basis for calculating an individual tenant's utility allowance or for providing a remedy if there is a violation, simply defy judicial enforcement.

The Court's only response to the legislative and regulatory history of the utility regulations is to suggest that other actions taken by Congress and HUD show that they were of the view that low-income tenants could resort to federal courts when claiming that a PHA violated the utility regulations. See *ante*, at 424–427, 430, n. 11. That is simply not the case. The three actions by Congress and HUD identified in the Court's opinion are the congressional hearings preceding the Omnibus Budget Reconciliation Act of 1981, Pub. L. 97–35, § 322, 95 Stat. 400; the 1985 enactment of 42 U. S. C. § 1437d(k) (1982 ed., Supp. III) and HUD's implementing regulations, 24 CFR § 966.50 *et seq.* (1986); and HUD's comments accompanying its final utilities regulations, 49 Fed. Reg. 31399 (1984). The hearings preceding the 1981 Act merely address the effect of that legislation on tenants' general ability to enforce their rights under the Housing Act; they provide no assistance in determining whether those rights include reasonable utilities. As for the enactment of § 1437d(k), HUD has consistently taken the view, as the Court acknowledges, that "the grievance mechanism is not available for challenges to the general utility allowance schedules." *Ante*, at 427, n. 8. HUD's comments in 1986 in connection with proposing new grievance hearing regulations do not suggest that HUD believes low-income tenants have an enforceable right to reasonable utilities:

> "PHA action or non-action concerning general policy issues or class grievances (including determination of the PHA's schedules of allowances for PHA-furnished utilities or of allowances for Tenant-purchased utilities) does not constitute adverse action by the PHA, and the PHA is not required to provide the opportunity for a hearing

to consider such issues or grievances." 51 Fed. Reg. 26528 (1986).

Moreover, HUD's proposed utilities regulations in 1982 stated that a PHA's determination of utilities allowances was subject to review "pursuant to such procedures as may be available under State or local law." 47 Fed. Reg. 35249, 35254. In 1984, responding to comments challenging its "power . . . to divest Federal courts of jurisdiction," 49 Fed. Reg. 31399, 31403, HUD amended the provision to state that PHA allowance determinations are valid unless found to be arbitrary, capricious, an abuse of discretion, "or otherwise not in accordance with law." 24 CFR § 965.473(e) (1986). The agency's explanation for this change was that "the Department's power to preclude access to Federal court is doubtful." 49 Fed. Reg. 31403 (1984). Thus, HUD did not express the view that there is a right to reasonable utilities enforceable in federal courts; it simply recognized that it lacked authority to determine federal jurisdiction. Indeed, the regulations indicate that while it did not have the authority finally to resolve the question, HUD viewed utilities determinations as a matter for state rather than federal courts.

In my view, petitioners do have a remedy in seeking to secure utilities from respondent: they may sue on their leases.[2] Pursuant to its authority to ensure the lower rental character of publicly assisted housing, see 42 U. S. C. §§ 1437c and

---

[2] Paragraph 4 of respondent's standard lease provides:

"Utilities: Management Agent agrees to furnish at no charge to the Resident the following utilities as reasonably necessary: hot and cold water, gas for cooking, and electricity for lighting and general household appliances and heat at appropriate times of the year, and also range and refrigerator. Resident will be required to pay for all excess consumption of utilities above the monthly allocated amount as developed by the Authority and determined by the individual check meter servicing the leased unit. The schedule of allocations and charges for excess consumption is posted on the bulletin board of each Housing Development office." Record, Exh. H.

1437d (1982 ed. and Supp. III), HUD requires PHA's to set forth in their leases that they will "supply running water and reasonable amounts of hot water and reasonable amounts of heat at appropriate times of the year (according to local custom and usage)," 24 CFR § 966.4(e)(7) (1986), and will "maintain in good and safe working order and condition electrical, plumbing, sanitary, heating, ventilating, and other facilities and appliances, including elevators, supplied or required to be supplied by the PHA." § 966.4(e)(5). HUD has developed a standard lease reflecting these requirements, see HUD Circular RHM 7465.8 (Feb. 22, 1971), which respondent's leases closely follow. Thus, respondent is contractually obligated to furnish, "as reasonably necessary," "hot and cold water, gas for cooking, and electricity for lighting and general household appliances and heat at appropriate times of the year, and also range and refrigerator." If respondent fails to fulfill these obligations, petitioners may, like any other tenants, bring suit for breach of contract.

For the reasons given above, however, in my view petitioners do not also have a statutory entitlement enforceable in federal courts by virtue of 42 U. S. C. § 1983. Neither the Brooke Amendment's language, nor its legislative history, nor its interpretation by HUD supports the conclusion that Congress intended to create an entitlement to reasonable utilities when it enacted the statute; and even if agency regulations, standing alone, could create such a right, the temporary regulations relied upon by petitioners in this case are not susceptible of judicial enforcement. On that basis, I believe that the judgment of the Court of Appeals for the Fourth Circuit should be affirmed. Accordingly, I respectfully dissent.