14-1328-cv
*Briggs v. Bremby*

**UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

August Term, 2014

(Argued: March 3, 2015          Decided: July 6, 2015)

Docket No. 14-1328-cv

─────────────────────────────

JAMES BRIGGS, INDIVIDUALLY AND ON BEHALF OF ALL OTHER PERSONS
SIMILARLY SITUATED,

*Plaintiff-Appellee*,

− v. −

RODERICK BREMBY, IN HIS OFFICIAL CAPACITY AS COMMISSIONER OF THE
STATE OF CONNECTICUT DEPARTMENT OF SOCIAL SERVICES,

*Defendant-Appellant.*

─────────────────────────────

Before: CALABRESI, HALL, and CARNEY, *Circuit Judges*.

Plaintiff brought suit on behalf of a class of food stamp applicants, arguing that the Food Stamp Act requires the Connecticut Department of Social Services to provide food stamp benefits to all eligible households within 30 or 7 days of application (depending on the household's level of economic need). The District Court granted Plaintiff classwide relief through a preliminary injunction, and Defendant now appeals, arguing that there is no private right of action to enforce the time limits of the Food Stamp Act under 42 U.S.C. § 1983. Defendant further argues that federal regulations permit the Connecticut Department of Social Services to take more time to process food stamp applications, thereby excusing it from the seeming requirements of the statute. We conclude that (1) food stamp applicants can sue under § 1983 to enforce the statutory time limits for provision of food stamps, and (2) federal regulations do not excuse Defendant from providing food stamps within the statutory time limits. We therefore AFFIRM the judgment of the District Court.

MARC COHAN, National Center for Law and Economic Justice, New York, NY (Mary R. Mannix and Greg Bass, National Center for Economic Justice, and Giovanna Shay, Lucy Potter, and Cecil Thomas, Greater Hartford Legal Aid, *on the brief*), *for Plaintiffs-Appellees*.

1

HUGH BARBER, Assistant Attorney General (Rosemary M. McGovern, Assistant Attorney General, *on the brief*), *for* George Jepsen, Attorney General of Connecticut, *for Defendant-Appellant.*

CALABRESI, *Circuit Judge*:

## I. BACKGROUND

Plaintiff James Briggs brings this suit under 42 U.S.C. § 1983 against the Commissioner of the Connecticut Department of Social Services ("DSS") to enforce the Food Stamp Act's time limits for awarding food stamp benefits. 7 U.S.C. § 2020(e)(3) and (9) provide that participating states shall give such benefits within 30 days of application to eligible households, and within 7 days of application to especially needy households that qualify for expedited benefits. Plaintiff sued in the United States District Court for the District of Connecticut to enforce these time limits, and moved to certify a class of similarly situated plaintiffs.

The District Court (Bryant, *J.*) certified a class consisting of all past, current, and future Connecticut food stamp applicants whose applications are not processed in a timely manner. The District Court also found that there was credible evidence that "there is ongoing, persistent systemic failure to comply with the strict unambiguous mandates imposed by the [Food Stamp Act]," and entered a preliminary injunction requiring the DSS to process food stamp applications within the statutory deadlines. *Briggs v. Bremby*, 2012 WL 6026167 at *18-19 (D. Conn. Dec. 4, 2012). Defendant now appeals, arguing a) that the Food Stamp Act does not give Plaintiff a right to the timely receipt of food stamps and, therefore, that Plaintiff cannot seek to enforce these time limits under 42 U.S.C. § 1983, and

2

b) that, in any event, federal regulations excuse the DSS from abiding by the seeming statutory deadlines for providing food stamp benefits.

## II. DISCUSSION

Where allegations of error in a preliminary injunction involve questions of law, our review is *de novo*. *Am. Express Fin. Advisors Inc. v. Thorley*, 147 F.3d 229, 231 (2d Cir. 1998).

**A. Plaintiff can maintain a private lawsuit under 42 U.S.C. § 1983 to enforce the statutory time limits in 7 U.S.C. § 2020(e)(3) and (9)**

7 U.S.C. § 2020(e)(3) states:

> The State plan of operation . . . . shall provide . . . . (3) that the State agency shall thereafter promptly determine the eligibility of each applicant household by way of verification of income . . . . household size (in any case such size is questionable), and such other eligibility factors as the Secretary determines to be necessary . . . . so as to complete certification of and provide an allotment retroactive to the period of application to any eligible household not later than thirty days following its filing of an application[.]

7 U.S.C. § 2020(e)(9) states:

> The State plan of operation . . . . shall provide . . . . (9) that the State agency shall – (A) provide benefits no later than 7 days after the date of application to any household which-- (i) (I) has gross income that is less than $150 per month; or (II) is a destitute migrant or a seasonal farmworker household in accordance with the regulations governing such households in effect July 1, 1982; and (ii) has liquid resources that do not exceed $100[.]

In *Blessing v. Freestone*, 520 U.S. 329 (1997), the Supreme Court established a three-part test for determining whether a federal law creates a right that can presumptively be enforced by private suit through § 1983: 1) "Congress must have intended that the provision in question benefit the plaintiff," 2) "the plaintiff must demonstrate that the right assertedly protected by the statute is not so vague and amorphous that its enforcement would strain judicial competence," and 3) "the statute must unambiguously impose a binding obligation

on the States." *Id.* at 340-41 (internal citations and quotation marks omitted). The Court has further clarified that "it is *rights*, not the broader or vaguer 'benefits' or 'interests,' that may be enforced" under § 1983, and that nothing short of an "unambiguously conferred right" will support a cause of action under § 1983. *Gonzaga University v. Doe*, 536 U.S. 273, 283 (2002). If these requirements are met, then there is a rebuttable presumption that the statutory right can be enforced through § 1983. *Id.* at 341.

The two statutory time limits at issue in this case clearly meet the second and third prongs of the *Blessing* test. They establish a right that is neither vague nor amorphous (both provisions require the allotment of food stamps within a definite number of days), and they impose binding obligations on the States (both provisions use the mandatory "shall"). Whether Congress intended these provisions to benefit food stamp applicants, as the first *Blessing* prong requires, justifies a bit more discussion.

Plaintiff argues that the time limits were intended to benefit food stamp applicants by ensuring the prompt provision of food stamps. Defendant contends instead that the time limits were meant only to guide the States in how to marshal their resources when administering food stamp programs. Three Supreme Court decisions inform our analysis of whether these statutory provisions are sufficiently focused on benefitting the relevant plaintiffs to be individually enforceable under § 1983.

First, in *Wright v. City of Roanoke Redevelopment & Housing Authority*, 479 U.S. 418 (1987), the Court held that a rent ceiling provision of the Public Housing Act empowered tenants to sue under § 1983 to collect for past overcharges. The relevant provision, 42 U.S.C. § 1437a, imposed the following rent ceiling requirement on local housing authorities:

> Dwelling units assisted under this chapter shall be rented only to families who are lower income families at the time of their initial occupancy of such

4

units. Reviews of family income shall be made at least annually. A family shall pay as rent for a dwelling unit assisted under this chapter . . . the highest of the following amounts, rounded to the nearest dollar:
(1) 30 per centum of the family's monthly adjusted income;
(2) 10 per centum of the family's monthly income; or
(3) if the family is receiving payments for welfare assistance from a public agency and a part of such payments, adjusted in accordance with the family's actual housing costs, is specifically designated by such agency to meet the family's housing costs, the portion of such payments which is so designated.

*Wright*, 479 U.S. at 420 n.2 (internal quotation marks omitted).

This rent ceiling provision was part of a detailed statutory scheme that established requirements for state and local housing authorities. But despite the fact that the statute was directed at government agencies, the Court in *Wright* held that the rent ceiling provision was enacted to benefit tenants. *See Wright* at 430. In drawing this conclusion, the Court focused on the fact that the provision was calibrated to the economic needs of individual families, determining each family's rent based on a percentage of their monthly income. According to the Court, this constituted powerful evidence that the provision was intended to benefit the families, and not merely to direct the allocation of government resources. *See Id.* at 430 ("The [rent ceiling provision] could not be clearer: . . . tenants could be charged as rent no more and no less than 30 percent of their income. This was a mandatory limitation focusing on the individual family and its income. The intent to benefit tenants is undeniable.").

Subsequently, in *Wilder v. Virginia Hospital Association*, 496 U.S. 498 (1990), the Court found a private right of action under § 1983 to enforce a reimbursement provision of the Medicaid Act. *Wilder* involved a statutory provision, 42 U.S.C. § 1396a(a)(13)(A), that required state Medicaid plans to provide "reasonable and adequate" rates of reimbursement for health care providers treating needy individuals. In relevant part, § 1396a(a)(13)(A) stated the following:

5

[A] State plan for medical assistance must – . . . . provide . . . for payment . . . of the hospital services, nursing facility services, and services in an intermediate care facility for the mentally retarded provided under the plan through the use of rates (determined in accordance with methods and standards developed by the State . . .) which the State finds, and makes assurances satisfactory to the Secretary, are reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities in order to provide care and services in conformity with applicable State and Federal laws, regulations, and quality and safety standards . . . .

*Wilder*, 496 U.S. at 502-03 (emphasis and internal quotation marks omitted).

This provision was explicitly directed at government actors. It referred to requirements of the "State plan" and the procedures and policies developed by the "State." Nonetheless, the Court found that its terms were individually enforceable through private lawsuits brought by health care providers under § 1983. The Court did so in part because the language indicated a clear intent to benefit these providers. *Id.* at 510 ("There can be little doubt that health care providers are the intended beneficiaries of the [reimbursement provision]. The provision establishes a system for reimbursement of providers and is phrased in terms benefiting health care providers . . . ."). *Wilder* thus demonstrates that a statute imposing a requirement on a "State plan" for administering a social welfare program may nevertheless in appropriate circumstances give rise to a right enforceable under § 1983, for instance if it includes a specific mandate intended to give rights to a particular group.

Finally, in *Gonzaga University v. Doe*, 536 U.S. 273 (2002), the Court held that a provision of the Family Educational Rights and Privacy Act ("FERPA") could not be individually enforced through § 1983. The relevant provision, 20 U.S.C. § 1232g(b)(1), stated:

No funds shall be made available under any applicable program to any educational agency or institution which has a policy or practice of permitting the release of education records (or personally identifiable information

6

> contained therein . . . ) of students without the written consent of their parents to any individual, agency, or organization.

*Gonzaga*, 536 U.S. at 279 (internal quotation marks omitted).

The Court distinguished this provision from those in *Wright* and *Wilder*, noting three of its features. First, the statutory language at issue in *Gonzaga* is focused on the educational agencies being regulated rather than on the interests of students or parents. That is to say, the provision lacks "the sort of 'rights-creating' language critical to showing the requisite congressional intent to create new rights." *Id.* at 287. Second, the provision regulates only the general "policy or practice" of educational agencies and institutions regarding disclosure, rather than focusing on specific instances of disclosure. Third, the provision serves primarily to direct the distribution of federal resources. *Id.* at 287-91. Based on these factors, the Court concluded that the provision was not intended to confer individual rights upon students or parents, but was instead intended to impose a general rule for the use of funds under FERPA. *See also Loyal Tire & Auto Ctr., Inc. v. Town of Woodbury*, 445 F.3d 136, 149 (2d Cir. 2006) (stating that the *Gonzaga* Court had used these three factors to distinguish privately enforceable "rights" from vaguer "benefits" or "interests").

*Wright* and *Wilder* both strongly counsel in favor of finding the time limits of 7 U.S.C. §§ 2020(e)(3) and (9) privately enforceable under § 1983. Like the provisions in *Wright* and *Wilder*, the Food Stamp Act's time limits are drafted in a way that focuses on the needs of the individual beneficiaries. They require that households' eligibility be determined "promptly," and that allotments be provided retroactive to the period of application. They are also calibrated to household income – eligible households are to be provided food stamp benefits within 30 days, but especially needy ones are to receive such benefits within 7 days.

7

And, while the Food Stamp Act's time limits are written as requirements for a "State plan of operation," the Court in *Wilder* concluded that such a formulation can be fully consistent with a legislative intent to confer enforceable rights upon the relevant plaintiffs. *Wilder*, 496 U.S. at 523. Indeed, it is commonplace that laws designed to protect individual rights are formulated as restrictions on government action. *See, e.g.*, U.S. Const. amend. I ("Congress shall make no law . . .").

Nor does *Gonzaga* undercut the applicability of *Wright* and *Wilder* to the case before us. None of the three factors that the Supreme Court used to distinguish the statute in *Gonzaga* from those in *Wright* and *Wilder* apply to the provisions here. Unlike the funding provision involved in *Gonzaga*, the Food Stamp Act's time limits (1) contain language that is focused on the interests of the applicant households and calibrated to their economic needs, (2) create a specific requirement that must be followed for every food stamp applicant, rather than a generalized "policy or practice," and (3) do not merely direct the distribution of funds. These factors establish that Congress has conferred individual rights upon food stamp applicants in clear and unambiguous terms, and *Gonzaga* is thus distinguishable.

The law of our circuit concerning the private enforceability of time limits in social welfare statutes is, moreover, in full accord with our reading of these three Supreme Court cases. *See, e.g.*, *Shakhnes v. Berlin*, 689 F.3d 244, 247, 254, 256-57 (2d Cir. 2012) (concluding that private plaintiffs can sue under § 1983 to enforce a Medicaid provision, 42 U.S.C. § 1396a(a)(3), which requires that a "State plan" must provide "an opportunity for a fair hearing before the State agency to any individual whose claim for medical assistance under the plan is denied or is not acted upon with reasonable promptness," and concluding, also,

8

that such plaintiffs can enforce a regulation providing that such a hearing will occur "ordinarily within 90 days" of a hearing request).

Accordingly, we find that 7 U.S.C. § 2020(e)(3) and (9) satisfy the *Blessing* test, and therefore create a rebuttable presumption that the time limits in those sections are privately enforceable under § 1983. *Blessing*, 520 U.S. at 341. This presumption can, however, be overcome if Congress precluded recourse to § 1983 either "expressly," or "impliedly, by creating a comprehensive enforcement scheme that is incompatible with individual enforcement under § 1983." *Id.*

Briggs's assertion that Congress intended to confer individual rights to timely determination of food stamp eligibility is undermined, Defendant argues, by Congress's authorization of administrative enforcement of the Food Stamp Act's time limits. In particular, 7 U.S.C. § 2020(g) empowers the Secretary of Agriculture to investigate State noncompliance, withhold federal funds, and refer a noncompliant State to the Attorney General to seek an injunction. Defendant asserts that Congress's grant of those enforcement powers to the Secretary demonstrates that Congress did not intend to permit parallel enforcement by individuals in federal and state courts. Notably, the Supreme Court concluded in *Gonzaga* that Congress did not mean to confer individual rights under FERPA, in part because that statute created a comprehensive and centralized agency hearing procedure to deal with individual complaints. *See Gonzaga*, 536 U.S. at 289-90. In stark contrast with FERPA, however, the Food Stamp Act contains no similar agency adjudication process or enforcement structure that could take the place of private lawsuits. Rather, the statute before us is analogous to those in *Wright* and *Wilder*. The statutes in both of those cases gave the appropriate federal agencies the power to exercise oversight and

withhold funds, but that authority was held to be consistent with a private right to sue under § 1983 because the statutes at issue did not construct frameworks for resolving individuals' complaints. *See Wright*, 479 U.S. at 427-28; *Wilder*, 496 U.S. at 521-23.

We conclude that Congress did not impliedly preclude private enforcement of the Food Stamp Act's time limits by granting enforcement powers to the Secretary of Agriculture.[1] And we therefore hold that the time limits for allocating food stamps provided in 7 U.S.C. § 2020(e)(3) and (9) are privately enforceable through lawsuits brought under § 1983.[2]

## B. Federal regulations do not excuse the DSS from processing food stamp applications within the statutory time limits

Defendant argues that the preliminary injunction issued by the District Court conflicts with a number of federal regulations. *See, e.g.*, 7 C.F.R. § 273.2(h) (establishing procedures for situations where the State agency is at fault for not allocating food stamps within 30 days of an application, and for situations where the applicant household is at fault for not completing the eligibility determination process within 30 days); 7 C.F.R. § 273.2(i)(3)(iv) (providing that if the initial screening for "expedited" (7-day) food stamp eligibility fails to identify that a household is eligible, then the State agency is only required to process the application within 7 days of the date it discovers that the household is eligible

---

[1] If more were needed, we note that this conclusion is amply supported by the legislative history of the Food Stamp Act. *See, e.g.*, H.R. Rep. No. 95-464, at 398 (1977), *reprinted in* 1977 U.S.C.C.A.N. 1978, 2327 ("The administrative remedies against the state contained in section 11(f) and elsewhere should not be construed as abrogating in any way private causes of action against states for failure to comply with Federal statutory or regulatory requirements.").

[2] This holding puts us in agreement with the Eleventh Circuit and the Fifth Circuit, which have both held that analogous statutory time limits in prior iterations of the Food Stamp Act were individually enforceable. *See Gonzalez v. Pingree*, 821 F.2d 1526 (11th Cir. 1987); *Victorian v. Miller*, 813 F.2d 718 (5th Cir. 1987) (en banc).

for expedited service). Defendant interprets these regulations as excusing the DSS from having to follow the Food Stamp Act's time limits.

In support of its reading of these regulations, Defendant argues that 7 U.S.C. § 2020(e)(3) requires only that the DSS complete the certification of "eligible households" within 30 days, and that "eligibility" need only be determined "promptly." To make this point, Defendant contrasts two statutory phrases. The first provides that "the State agency shall thereafter promptly determine the eligibility of each applicant household." The second requires that the State agency must "complete certification of and provide an allotment retroactive to the period of application to any eligible household not later than thirty days following its filing of an application." 7 U.S.C. § 2020(e)(3). Defendant contends that while the second phrase imposes a specific 30-day time limit as to eligible households, the DSS need only "determine the eligibility" of non-eligible applicant households "promptly" (rather than within any set time period).

The obvious problem with this interpretation is that there would be no way for the DSS to complete certification and provide an allotment of food stamps to all "eligible households" within 30 days of the filing of an application, as 7 U.S.C. § 2020(e)(3) expressly requires, if the DSS did not first determine – not only "promptly," but well within 30 days – which households are "eligible" and which are not. We therefore agree with the District Court that both the eligibility determinations and the allotments must be made within 30 days. And, accordingly, there is no basis for Defendant's interpretation of these regulations.

The regulations simply provide additional procedures in case something goes wrong and a statutory deadline is missed. Regulations which anticipate that a State agency will sometimes fail to meet statutory deadlines, and which provide food stamp applicants with

fallback procedures to deal with such situations, cannot be read to repeal those deadlines. Such regulations supplement 7 U.S.C. § 2020(e)(3) and (9); they do not override them. Indeed, if the regulations did purport to repeal or limit the statutory time limits, they would likely be *ultra vires*, for no agency regulation can overturn a clear statutory mandate.

## III.    CONCLUSION

For the foregoing reasons, we AFFIRM the judgment of the District Court.