Sherry JACKSON, on Behalf
of Priscilla JACKSON

v.

PHILADELPHIA HOUSING
AUTHORITY, et al.

Civ. A. No. 93–6314.

United States District Court,
E.D. Pennsylvania.

July 18, 1994.

---

Michael Donahue, George Gould, Community Legal Services, Philadelphia, PA, for plaintiff.

Michael Pileggi, Philadelphia Housing Authority, Philadelphia, PA, for defendant.

## MEMORANDUM OF DECISION

RUETER, United States Magistrate Judge.

In 1850, lawyer Abraham Lincoln urged his fellow attorneys to attempt to settle disputes without resorting to litigation. Mr. Lincoln expressed this common-sense advice with his usual eloquent prose:

> Discourage litigation. Persuade your neighbors to compromise whenever you can. Point out to them how the nominal winner is often the real loser—in fees, expenses, and waste of time. As a peacemaker, the lawyer has a superior opportunity of being a good man. There will still be business enough. Never stir up litigation.

Notes for Law Lecture, July 1, 1850, in 1 *Complete Works of Abraham Lincoln,* 142 (J. Nicolay and J. Hay, ed.). The issue before the Court tests the principles expressed by our sixteenth President: Should the Court award fees to an attorney who made no attempt to resolve an ordinary landlord-tenant dispute prior to filing a federal civil rights complaint against a public housing authority?

## I. *PROCEDURAL HISTORY*

The plaintiff, Sherry Jackson, represented by the Community Legal Services, Inc. ("CLS"), a non-profit legal services organiza-tion, filed this action on November 29, 1993, alleging that her landlord, the Philadelphia Housing Authority ("PHA"), violated the civil rights of her mother, Priscilla, by failing: (1) to make repairs to her apartment; (2) to calculate correctly her rent; (3) to pay the correct utility allowance; and (4) to make necessary alterations to accommodate her mother's physical disabilities.[1] The case, filed pursuant to 42 U.S.C. § 1983, and the United States Housing Act, 42 U.S.C. § 1437, was assigned to the Honorable John R. Padova.

On January 10, 1994, approximately forty days after the commencement of the case, the parties entered into a stipulation settling the case. The plaintiff later moved to enforce the settlement alleging that the PHA was not complying with the settlement agreement. On April 26, 1994, the parties executed a final settlement stipulation and the case was closed, except for the issue of plaintiff's attorney fees. During the course of the case, the parties conducted little discovery. The docket entries only show that the plaintiff served a set of interrogatories and a request for documents.

CLS has filed a petition, pursuant to 42 U.S.C. § 1988, for an award of attorney fees in the amount of $5,103.00. The PHA opposes the award of any fees to the CLS, on the grounds that CLS should have attempted to resolve this "routine" tenant complaint without resorting to a federal lawsuit. Specifically, the PHA argues that before filing this action, CLS should have made an informal complaint to PHA or filed a formal grievance pursuant to a procedure established by PHA with the concurrence of CLS. PHA represents that it would have satisfied plaintiff's demands without the lawsuit—all she had to do was make a request through the proper channels.

CLS readily concedes that prior to filing this action, it made no attempt to communicate to the PHA the problems of its clients,

---

**1.** The plaintiff sought to enforce various rights bestowed upon public housing tenants by federal law. *See* 24 C.F.R. § 966.4(e)(1)–(7) requiring the public housing authority to make necessary repairs to the dwelling unit and to maintain it in a decent, safe, and sanitary condition; 24 C.F.R. § 913.101, *et seq.,* setting forth how the public housing unit should calculate rent; 24 C.F.R. §§ 913.102, 913.108 and 960.208 outlining the authority's responsibility of providing reimbursement for utilities; 24 C.F.R. § 966.7, requiring the public housing authority to make accommodations for people with physical disabilities.

Sherry and Priscilla Jackson. CLS claims that such communication would have been fruitless, since in its experience PHA does not respond adequately to its tenants' problems. Furthermore, CLS contends that the plaintiff and her mother would have suffered "irreparable harm" from PHA's delay in addressing her problems.

Upon consent of both parties, the issue of the attorney fees was referred to me by Judge Padova for disposition pursuant to 28 U.S.C. § 636(c)(3). On June 13, 1994, I held an evidentiary hearing on the application for attorney fees. CLS later filed a Supplemental Fee Petition requesting an additional $4,791.00 in fees for time spent on the hearing.

The evidence presented at the hearing and the arguments of counsel focused on two issues. First, whether the CLS, as attorneys paid with public funds, must exhaust available state remedies, or otherwise informally attempt to resolve their client's claims, prior to filing a federal lawsuit. Second, whether the request of CLS for fees should be denied or reduced for failure to make these pre-litigation efforts.

## II. *FACTUAL BACKGROUND*

Priscilla Jackson is a PHA tenant, who resided with her mother, Mae Bell Thomas, in a rental unit at 2112 N. 16th Street, Apartment A, Philadelphia, Pennsylvania. Mae Bell Thomas was the "head of household"[2] until May 6, 1993, the date on which she died. Priscilla Jackson is a disabled person and is wheelchair bound. (Stipulation, dated 6/8/94, ¶ 3, N.T. 6/13/94, 78). In April 1993, Sherry Jackson, Priscilla's daughter, moved into 2112 N. 16th Street, Apartment A, along with her two children. (N.T. 6/13/94, 88). She moved into the apartment to care for her ailing grandmother and handicapped mother. (N.T. 6/13/94, 90).

Sherry Jackson did not inform management of PHA that she was moving into her grandmother's apartment because she "didn't

really plan on staying there." (N.T. 6/13/94, 89). After her grandmother died, Sherry Jackson requested to be made "head of household" for the 2112 N. 16th Street apartment, because her mother, Priscilla, was not competent to handle her own affairs. (N.T. 6/13/94, 94–96, 99). Specifically, in May 1993, she met with the PHA assistant manager responsible for her grandmother's apartment and spoke to him about becoming head of household. She testified that at the time, she filled out some papers to accomplish this goal. (N.T. 6/13/94, 98). Ms. Jackson also testified that she told the PHA manager about the many defective conditions in the apartment that needed repair (N.T. 6/13/94, 102); but the manager told her she "had no reason to complain" because she had "no right to be there," since she was not listed on the PHA lease. (N.T. 6/13/94, 103–04). Ms. Jackson also testified that she "called" PHA and told them about the poor condition of the bathroom and the ceiling and floors of the apartment, but her testimony was vague about whom she spoke to and when the call was made. (N.T. 6/13/94, 102, 108–09).

Ms. Jackson stated that shortly after meeting with the assistant manager at PHA, she contacted the Community Legal Services. (N.T. 6/13/94, 107). The time sheets submitted by CLS to support its fee application show that the first conference with the client occurred on November 23, 1993, when she met with Michael Donahue, Esquire, a supervising attorney at CLS who works in a two-lawyer unit in the CLS which specializes on issues concerning public housing in the City of Philadelphia.

Mr. Donahue testified that approximately 80% of his caseload is representing individual tenants who are experiencing problems with the PHA. He testified that he personally files approximately one civil rights case a week in this Court against the PHA, for a total of about fifty (50) cases a year. (N.T.

---

**2.** As "head of household," Mae Bell Thomas was the named tenant on the lease and, thus, she obtained a leasehold in the property. Since public housing in Philadelphia is in great demand, being named "head of household" is beneficial.

(N.T. 6/13/94, 46–49). Because Priscilla Jackson had resided with her mother in the unit for several years, PHA did not dispute she was entitled to be "head of the household" after her mother died. (N.T. 6/13/94, 53–54).

6/13/94, 113, 188).[3] Mr. Donahue testified that he counseled Sherry Jackson to file "immediately" a civil rights action in federal court because he "thought there was irreparable harm going on" in that Priscilla Jackson needed assistance because of her handicap status and that there was "a threat from PHA management that, in fact, Sherry Jackson might be evicted as a squatter." In addition, Mr. Donahue stated that, in his experience, the PHA grievance process was futile, slow, "and so rarely complied with," and, as a result, he recommended that his client "go directly to court." (N.T. 6/13/94, 116).

## III. *DISCUSSION*

### A. Standard for Award of Attorney Fees

■ The Civil Rights Attorney's Fee Awards Act of 1976, 42 U.S.C. § 1988, provides that "[i]n any action or proceeding to enforce [42 U.S.C. § 1983]—the court, in its discretion, may allow the prevailing party . . . a reasonable attorney's fee as part of the costs." A party represented by a nonprofit legal services organization may recover attorney's fees under section 1988. *Blum v. Stenson*, 465 U.S. 886, 895, 104 S.Ct. 1541, 1547, 79 L.Ed.2d 891 (1984).

■ The party requesting attorney fees has the burden of demonstrating that her request is reasonable. *Rode v. Dellarciprete*, 892 F.2d 1177, 1183 (3d Cir.1990). To satisfy this burden, the fee petitioner must "submit evidence supporting the hours worked and rates claimed." *Hensley v. Eckerhart*, 461 U.S. 424, 433, 103 S.Ct. 1933, 1939, 76 L.Ed.2d 40 (1983). The party challenging the fee petition must make specific objections that are sufficient to give fee applicants notice of the objections to the requested fee. *Rode v. Dellarciprete, supra* at 1183. "Once the adverse party raises objections to the fee request, the district court has a great deal of discretion to adjust the fee award in light of those objections." *Id.*

■ An attorney fee award is calculated by multiplying the number of hours reasonably expended on the litigation times a reasonable hourly rate. *Hughes v. Repko*, 578 F.2d 483, 485 (3d Cir.1978). The reasonable hourly rate multiplied by the reasonable hours is known as the lodestar. Generally, the lodestar is presumed to be the reasonable fee. However, the court "has the discretion to make certain adjustments to the lodestar." *Rode v. Dellarciprete*, 892 F.2d 1177, 1183 (3d Cir.1990). Specifically, the lodestar may be adjusted downward if awarding the lodestar amount would be unreasonable. *Hensley v. Eckerhart*, 461 U.S. 424, 434, 103 S.Ct. 1933, 1939–40, 76 L.Ed.2d 40 (1983).

### B. General Objections to the Fee Petition

PHA has made three general objections to the award of attorney fees to the plaintiff: (1) plaintiff is not a prevailing party; (2) she did not exhaust available administrative remedies; and (3) given the special circumstances of this case, an award of attorney fees would be unjust. PHA also made specific objections to certain hours for which PHA seeks compensation. I will address the general objections now and later discuss the specific objections when making the lodestar analysis.

#### 1. *Prevailing Party*

■ A prerequisite to an award of attorney's fees under 42 U.S.C. § 1988 is that the party must have been "prevailing." *Baumgartner v. Harrisburg Housing Auth.*, 21 F.3d 541, 544 (3d Cir.1994). To qualify as a prevailing party, a civil rights plaintiff must succeed on "any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit." *Hensley v. Eckerhart*, 461 U.S. 424, 433, 103 S.Ct. 1933, 1939, 76 L.Ed.2d 40 (1983). This success may be obtained through a consent decree or settlement. *Maher v. Gagne*, 448 U.S. 122, 129, 100 S.Ct. 2570, 2574–75, 65 L.Ed.2d 653 (1980); *Baumgartner v. Harrisburg Housing Auth., supra* at 544. In short, a plaintiff

---

**3.** This Court's dockets confirm Mr. Donahue's testimony. They show that CLS, as an organization, filed 151 cases against PHA since 1990. Mr. Donahue was responsible for filing 134 of these cases.

**470**

"prevails" when actual relief on the merits of his claim materially alters the legal relationship between the parties by modifying the defendant's behavior in a way that directly benefits the plaintiff. *Texas Teachers Assn. v. Garland School Dist.*, 489 U.S. 782, 792, 109 S.Ct. 1486, 1493–94, 103 L.Ed.2d 866 (1989).

■ Here, the final settlement stipulation entered between the parties achieved virtually all of the benefit the plaintiff sought in her complaint. She was able to cause PHA to agree to calculate correctly plaintiff's monthly rent and utility allowance; make all necessary repairs to the unit; and to have Priscilla Jackson named the "head of the household." However, PHA claims that plaintiff did not gain anything from the suit that she could not have obtained without litigation and, therefore, she did not "prevail" within the meaning of 42 U.S.C. § 1988. *See e.g., Coen v. Harrison County School Bd.*, 638 F.2d 24, 26 (5th Cir.1981), *cert. denied.* 455 U.S. 938, 102 S.Ct. 1427, 71 L.Ed.2d 647 (1982) (holding plaintiff not "prevailing party" because lawsuit was not necessary to relief). PHA claims it would have given plaintiff all the relief sought if only she made a formal request for the relief prior to the lawsuit. However, in this Circuit, the lawsuit does not have to be a "but for" cause or "the proximate cause" of the benefit achieved by the plaintiff, only a "materially contributing factor." *Metro. Pittsburgh Crusade for Voters v. Pittsburgh*, 964 F.2d 244, 251 (3d Cir. 1992).

Applying this liberal standard of causation, I find that the pressure of the lawsuit was a materially contributing factor in bringing about most of the relief sought by the plaintiff.[4] As a result of the lawsuit, counsel for the PHA gave almost immediate attention to plaintiff's complaint and acceded to most of her demands. The lawsuit resulted in a stipulated settlement in January 1994. When plaintiff perceived that PHA was not complying with the settlement, she moved to reopen the case. The pressure of the lawsuit enabled the plaintiff to induce the defendant to enter into a second and final stipulation of settlement in April 1994.

I conclude from the evidence in the record that plaintiff would not have swiftly achieved the rent and utility adjustments and the commitment to make repairs without the benefit of the lawsuit. Thus, it materially contributed to the plaintiff obtaining the requested relief.

*2. Exhaustion of Administrative Remedies*

■ PHA argues that plaintiff should be denied any fees because she did not exhaust available state court remedies. Specifically, PHA points out that it has established informal and formal grievance procedures whereby its tenants can make complaints that have not been satisfactorily resolved at the local management level. These procedures were established as a result of an action filed by CLS in this Court in the case of *Brown v. Philadelphia Housing Auth.*, Civil Action No. 72–2083. Federal law requires federally funded housing authorities to have such a procedure available. *See* 24 C.F.R. § 966.52. Congress' goal was "to provide a 'decentralized, informal, and relatively non-adversarial administrative process' for resolving tenant-management disputes." *Wright v. Roanoke Redevelopment and Housing Auth.*, 479 U.S. 418, 426, 107 S.Ct. 766, 771, 93 L.Ed.2d 781 (1987) (quoting *Samuels v. District of Columbia*, 770 F.2d 184, 189 (D.C.Cir.1985)).

The PHA Tenant Grievance Procedure works as follows: If a tenant has a complaint with PHA, she can make an informal request with the manager assigned to the unit. (N.T. 6/13/94, 75–76). A tenant can obtain forms to make the complaint from the local management office. *Id.* If a tenant is not satisfied with the response from the local manager, she could then contact central maintenance. If the tenant does not obtain any satisfaction from either the local or the central authorities, she may file a formal grievance procedure. Forms are available to the tenants to file a complaint. Once filed, a hearing is scheduled before an arbitrator selected and paid for by PHA. The arbitrator cannot be

---

**4.** As explained at p. 474, *infra*, the Court finds the lawsuit did not materially contribute to the

plaintiff receiving modifications to the rental unit because of Priscilla Jackson's disabilities.

an officer, employee or tenant of PHA. (Procedure, ¶ I(c)).

Any non-damage award is binding on PHA with the exception that PHA may appeal to the courts, if the arbitrator exceeded his authority or acted "arbitrarily." However, any award of damages may be reviewed *de novo* by a court, should any party appeal the award. (Procedure, ¶ 1(c)(10) and (13)); 24 C.F.R. § 966.57.

The grievance procedures provide for an "emergency grievance hearing" which "shall be scheduled within seven (7) working days of the filing of a Grievance Hearing Request." A tenant is entitled to this speedy hearing when the "grievance involves an imminent threat to the tenant's life, health or safety." (Stipulation ¶ 10, filed April 17, 1978 in *Brown v. PHA*, Civil Action No. 72–1083). *See also* 24 C.F.R. § 966.515(g).

CLS readily concedes neither it nor its client followed the grievance procedure established by PHA. CLS argues that the plaintiff, in a Section 1983 action, is not required to exhaust the grievance procedure as a prerequisite to seeking an award for attorney fees. PHA urges this Court to require a PHA tenant to utilize the grievance procedure before awarding attorney fees.

The two most often cited reasons advanced for the exhaustion of administrative remedies doctrine would be served if exhaustion were required here. First, requiring exhaustion of the PHA grievance process would give PHA "an opportunity to correct its own mistakes with respect to the programs it administers before it is haled into federal court." *McCarthy v. Madigan*, —— U.S. ——, ——, 112 S.Ct. 1081, 1086, 117 L.Ed.2d 291 (1992). "Frequent and deliberate flouting of administrative processes" would damage PHA's effectiveness "by encouraging people to ignore its procedures." *McKart v. United States*, 395 U.S. 185, 195, 89 S.Ct. 1657, 1663, 23 L.Ed.2d 194 (1969). Second, requiring tenants to file grievance procedures would serve judicial economy, because if PHA has the opportunity to correct its own errors, "a judicial controversy may well be mooted." *McCarthy v. Madigan, supra,* —— U.S. at ——, 112 S.Ct. at 1086.

The Supreme Court has ruled, however, that a plaintiff is not required to exhaust her state administrative remedies before filing an action pursuant to 42 U.S.C. § 1983. *Wright v. Roanoke Redevelopment and Housing Auth.,* 479 U.S. 418, 427–28, 107 S.Ct. 766, 772–73, 93 L.Ed.2d 781 (1987); *Patsy v. Board of Regents,* 457 U.S. 496, 516, 102 S.Ct. 2557, 2568, 73 L.Ed.2d 172 (1982). It follows that failure to exhaust administrative state remedies prior to filing a Section 1983 does not, in and of itself, preclude one from becoming a "prevailing party" entitled to attorney fees under 42 U.S.C. § 1988. *J & J Anderson, Inc. v. Town of Erie,* 767 F.2d 1469, 1475 (10th Cir.1985). Accordingly, the plaintiff here did not have to exhaust her state administrative remedies to recover attorney fees. Nonetheless, as explained later in this memorandum, a court may still consider a plaintiff's willful failure to take advantage of an obvious and easy opportunity to obtain relief without litigation, in determining the "reasonableness" of the attorney fee request.

### 3. *Special Circumstances Justifying a Denial of Attorney Fees*

 PHA's final general objection to the fee request is that it would be unjust to award attorney fees, when the plaintiff willfully failed to make pre-litigation efforts to obtain relief in the "routine" landlord-tenant dispute.

 A court may deny an award of attorney fees where "special circumstances" would render such an award unjust. *Hensley v. Eckerhart,* 461 U.S. 424, 429, 103 S.Ct. 1933, 1937, 76 L.Ed.2d 40 (1983); *Baumgartner v. Harrisburg Housing Auth.,* 21 F.3d 541, 550 (3d Cir.1994). The fact that a case was "simple" or could be "routinely handled" is not a "special circumstance" justifying a denial of attorney's fees; rather it is but one of the factors to be considered in determining the amount of the fee award. *Staten v. Housing Auth. of Pittsburgh,* 638 F.2d 599, 605 (3d Cir.1980).

Courts have invoked the "special circumstances" doctrine to deny fees when the filing of the lawsuit was superfluous and unnecessary to plaintiff's ultimate relief. *Greenside*

*v. Ariyoshi,* 526 F.Supp. 1194 (D.Haw.1981); *Naprstek v. City of Norwich,* 433 F.Supp. 1369 (N.D.N.Y.1977). In *Greenside, supra,* the district court held that, where it was unnecessary to file a civil rights action because settlement of the dispute could have been achieved without necessity of filing suit, the court should deny the plaintiff attorney fees. 526 F.Supp. at 1198. Similarly, in *Naprstek, supra,* the court denied fees after finding that plaintiff's counsel refused to accept defense counsel's offer to settle a dispute prior to the filing of a civil rights lawsuit. In his opinion, Judge MacMahon stated:

> "[W]e think that neither Congress nor the Supreme Court intended that private attorneys general need be encouraged to make mountains out of molehills. Nor do we think that Congress intended to reward attorneys for burdening federal courts with unnecessary litigation when they have not even attempted to remedy their clients' grievances by talking out their differences with duly constituted executive and legislative authorities at the local level."

433 F.Supp. at 1371.

 The Code of Professional Responsibility does not explicitly require an attorney to attempt to settle a dispute before filing a lawsuit. Nonetheless, as officers of the court, lawyers not only owe allegiance to their clients, but have a duty to spare the courts from unnecessary litigation. *See* H. Drinker, *Legal Ethics* 63–64 (1953). When possible, they should serve as "gatekeepers" to the legal process by diverting disputes "into mediative channels rather than translating them into adversary claims." *See* Galanter, *Reading the Landscape of Disputes,* 31 UCLA L.Rev. 4, 19 (1983).

Applying the above principles to the case at hand, this Court holds that the CLS should informally attempt to work out landlord-tenant problems, such as those at issue here, before it files a federal civil rights complaint. Furthermore, to encourage the informal resolution of these disputes, this Court, in the absence of unusual circumstances, should deny an award of attorney fees if the CLS willfully fails to make this prelitigation effort. Practically, this means that CLS, at a minimum, should give PHA *an opportunity* to correct its errors either by filing an informal grievance or proceeding with the formal grievance process.

Using, as a guidepost, the tenant grievance procedure developed by PHA and CLS as the result of the *Brown* litigation, CLS, at a minimum, should give PHA seven (7) days to correct emergency problems of its tenants. In non-emergency situations, PHA should be given a thirty (30) period to address a tenant's complaints. Only after PHA fails to address its tenants' problems within those time periods, should CLS consider bringing a civil rights lawsuit in federal court. After giving PHA the opportunity to correct its mistakes, CLS would be in a more justified position to demand an award of attorney fees.

At the evidentiary hearing before this Court, Michael Donahue, Esquire of CLS acknowledged that he did not communicate his client's problems to PHA prior to filing his civil rights lawsuit for two reasons. First, in his judgment, his client would have suffered "irreparable harm" if he delayed the lawsuit while attempting to resolve his client's dispute with the PHA. Secondly, Mr. Donahue testified that, in his opinion, it would have been futile to file a grievance with PHA. Mr. Donahue stated that PHA inordinately delays addressing tenants' grievances and PHA routinely does not comply with awards issued by arbitrators.[5]

This Court is sympathetic to the Mr. Donahue's frustrations in dealing with the bureaucracy of the PHA which administers approximately 22,000 rental units housing close to 80,000 residents. (N.T. 6/13/94, 204). The Court also applauds the efforts of CLS, in particular Mr. Donahue, in assisting indigent tenants, such as the plaintiff, in obtaining safe and secure housing. Nonetheless, this Court finds that the justification advanced by

---

**5.** Mr. Donahue testified that PHA rarely holds emergency hearings within the seven (7) day period, but the average time is 39 days. He could not estimate the length of time in non-emergency situations. (N.T. 6/13/94, 116). He further stated that in 90% of his cases, he has to go to federal court to enforce grievance awards. (N.T., 6/13/94, 186–87).

CLS is not sufficient to excuse its failure to not even *attempt* to secure relief for the plaintiff prior to the commencement of a federal lawsuit. Mr. Donahue did not make a phone call or write a letter to PHA's legal department explaining his client's problems and demanding relief. If PHA received such a letter, it would have had an opportunity to meet the plaintiff's demands, and it would have been aware of the threat of a lawsuit (with a potential award of attorney fees) if it did not fix plaintiff's problems.

Assuming that PHA has an inefficient bureaucracy, its tardiness in addressing tenants' problems does not excuse plaintiff's failure to attempt to work out these problems prior to filing this lawsuit. The Court does not see how the plaintiff would have suffered "irreparable harm" by giving PHA a brief opportunity to resolve an ordinary landlord-tenant problem without a federal lawsuit.[6] On November 23, 1993, Mr. Donahue met with his client. Six days later, on November 29, 1993, he filed his complaint in this Court. How would Ms. Jackson be harmed, if during the six days her attorney was preparing the complaint, Mr. Donahue communicated with PHA and explained his client's problems? At least, there would be no issue as to whether this lawsuit was superfluous or necessary to vindicate the plaintiff's rights.

While it would have been preferable had Mr. Donahue not filed this lawsuit first, and asked questions later, the Court, nonetheless, finds, that because of the unusual circumstances of this case, the application of CLS for attorney fees should be granted with some reductions. This is because, even after the lawsuit was commenced, PHA did not timely respond to plaintiff's complaints. In January 1994, approximately forty (40) days after the case was filed, PHA agreed to all of the plaintiff's demands and entered into a Stipulation of Settlement which was approved by the Court. This quick settlement does give credence to PHA's contention that this suit was unnecessary. CLS, however,

was compelled to reopen the case to enforce the settlement because of PHA's noncompliance. Thus, unlike the facts in the *Greenside* and *Naprstek* cases, discussed above, this case was not wholly superfluous and unnecessary to plaintiff's ultimate relief.

The first stipulation of settlement was approved by the Court on January 10, 1994. Under that stipulation, Priscilla Jackson was to have been made "head of household" and the paperwork was to be completed in sufficient time for Priscilla Jackson to receive a monthly rent statement by February 1, 1994. In addition, PHA agreed to make payments to the gas and electric utilities on behalf of Priscilla Jackson. As of February 11, 1994, PHA had not complied with any of these agreements and on March 4, 1994, Mr. Donahue, after notice to PHA counsel, moved to enforce the settlement agreement. (N.T. 6/13/94, 118). As a result of this motion, a final settlement stipulation resolving all of the outstanding issues was approved by the Court on April 26, 1994. The stipulation provided that PHA would make all of the repairs and make the necessary rent and utility adjustments. Thus, PHA's noncompliance with the first settlement agreement fulfilled Mr. Donahue's prophecy that PHA would be dilatory in resolving Priscilla Jackson's complaints.

## C. Calculation of Lodestar

### 1. *Reasonable Hours*

▇▇▇ In evaluating a fee petition, a court should exclude hours that are not reasonably expended. "Hours are not reasonably expended if they are excessive, redundant, or otherwise unnecessary." *Rode v. Dellarciprete*, 892 F.2d 1177, 1183 (3d Cir.1990).

CLS requests compensation for 24.3 hours of work performed on this case. With the exception of 2.4 hours spent by Mr. Donahue reviewing handicap accessibility plans, and incorporating those plans in a settlement

---

6. Mr. Donahue's allegation of irreparable harm was based primarily on the fear that Sherry Jackson would be evicted. (N.T. 6/13/94, 116). While Sherry Jackson was told she had "no right" to live in the premises, no formal eviction proceedings were commenced against her or her

mother. (N.T. 6/13/94, 158). While the harm plaintiff faced may have been serious or substantial, it was not "irreparable." *See Glasco v. Hills*, 558 F.2d 179, 181 (3d Cir.1977); *United States v. Pennsylvania*, 533 F.2d 107, 110 (3d Cir.1976).

agreement,[7] I find the time expended by CLS on this case to be reasonable.

### (i) *Handicap Accessibility Plans*

■ My reasons for not compensating the 2.4 hours devoted to the handicap accessibility plans are as follows. Based on the testimony at the evidentiary hearing, I find that the lawsuit was not a material factor in Priscilla Jackson receiving modifications to her home to accommodate her physical disabilities. It is undisputed that the first time anybody at PHA heard that the plaintiff's mother, Priscilla, needed modifications to her home, because of her physical disabilities, was after the lawsuit was commenced. (N.T. 6/13/94, 59). Margaret Fahringer, Accessibility Coordinator at PHA, is responsible for ensuring that PHA comply with Section 504 of the Federal Rehabilitation Act, 29 U.S.C. § 794, requiring that public housing authorities make accommodations for people with physical disabilities. Mr. Donahue conceded that Ms. Fahringer is "an articulate, capable, and dedicated person." (N.T. 6/13/94, 163). Ms. Fahringer first heard of Ms. Priscilla Jackson's needs when she received a telephone call on December 13, 1993 from Mr. Donahue, who called at the suggestion of PHA's counsel. (N.T. 6/13/94, 56, 164; time sheets of CLS, Appx. "D" to Petition). This was within two weeks after the filing of the lawsuit.

As a result of the call, Ms. Fahringer contacted the plaintiff and her family and on January 3, 1994, a PHA representative and architect visited and evaluated the rental unit. After interviewing Priscilla Jackson, the architect drafted plans to add a ramp, a new bathroom, and a wide door to the unit. The plan was dated February 28, 1994. In March 1994, the plans were approved by the family and an estimate in the amount of $30,000 was given to the PHA. (N.T. 6/13/94, 56). There is nothing to suggest that the lawsuit was necessary to get Ms. Fahringer to act on Priscilla Jackson's request. On the contrary, all that was needed was a phone call to her. This could have been easily done prior to a lawsuit.

Given that the record demonstrates that the filing of the lawsuit was not, in any way, a factor in causing PHA to respond to Priscilla Jackson's handicap needs, the Court finds that attorney fees expended for the 2.4 hours spent on this issue are not reasonable and will not be awarded.

### (ii) *Specific Objections*

PHA has objected to the reasonableness of specific hours in the time sheets of CLS. I find these objections to be without merit. First, based on Mr. Donahue's testimony, and my review of the drafted pleadings, I find that 4.5 hours drafting the complaint, the motion for preliminary injunction, discovery request and the motion to proceed *in forma pauperis* were reasonable.

I further find that the 3.2 hours negotiating and drafting the two stipulation agreements were reasonable, with the exception of .7 hours (12/11/93 and 12/15/93 entries) which were devoted to the wheelchair accessibility plans (N.T. 6/13/94, 126–128).

PHA objects to the .6 hours expended to draft and file a motion to reopen the case. The case was inadvertently marked closed by the Clerk of the District Court. (N.T. 6/13/94, 132–33). When Mr. Donahue informed Judge Padova's deputy clerk that there were still outstanding issues not resolved, the clerk informed him to file a motion to reopen the case. *Id.* at 133. Given that Mr. Donahue was following the instructions of court personnel, I find that the .6 hours expended were reasonable.

■ PHA objects to the 2.7 hours of time spent drafting and filing a motion to enforce the first settlement agreement, and reviewing PHA's response to the motion. As discussed earlier, it was necessary to file the motion. Although PHA did develop a handicap accessibility plan for Priscilla Jackson before the motion to enforce settlement was filed, PHA had not yet made her head of household, correctly calculated her rent, or made reimbursements for utilities. (N.T. 6/13/94, 134–35). Thus, plaintiff's counsel

---

7. The 2.4 hours were expended on the following dates: 12/11/93 (.4), 12/13/93 (.2), 12/15/93 (.3), 12/28/93 (.1), 12/30/93 (.1), 1/5/94 (.1), 1/10/94 (.3), 1/31/94 (.1), 2/7/94 (.1), 2/16/94 (.2), 2/17/94 (.3), 3/28/94 (.1), 3/31/94 (.1).

was compelled to file the motion.[8] Mr. Donahue did write a letter to PHA counsel on February 7, 1994 advising him that if the terms of the settlement agreement were not executed by March 1, 1994, he would file a motion to enforce the settlement. Thus, PHA had an opportunity to prevent the filing of the motion and the additional attorney's fees. The filing of the motion on March 4, 1994 caused the Court to hold a settlement conference on March 30, 1994 which resulted in the parties agreeing to the final stipulation of settlement filed on April 26, 1994. Thus, I find reasonable the 2.7 hours spent by Mr. Donahue on the motion to enforce settlement.

Finally, PHA objects to 2.6 hours spent by Mr. Donahue in drafting the fee petition in this case, on the grounds that counsel had filed numerous similar motions in the other civil rights cases he filed in this Court. The fee application is extensive. It contains a motion, a memorandum of law, and affidavits of Mr. Donahue, the plaintiff and Lorrie McKinley, a CLS attorney who is chairperson of the attorney's fee committee at CLS. The fee petition also attached numerous opinions from judges of this Court discussing fee awards to CLS in similar housing cases. The fee petition consists of much more than standard boilerplate language. I find that 2.6 hours spent in drafting the fee petition was reasonable.

In summary, I find that a total of 21.9 hours expended by Mr. Donahue on this case are compensable.

### 2. Hourly Rate

 The reasonable hourly rate is calculated according to the prevailing market rates in the relevant community. The Court must "assess the experience and skill of the prevailing party's attorneys and compare their rates to the rates prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation." *Rode v. Dellarciprete, supra* at 1183 Attorneys employed by a nonprofit organization are entitled to compensation at the market rate of the legal community at large. *Blum v. Stenson,* 465 U.S. 886, 895, 104 S.Ct. 1541, 1547, 79 L.Ed.2d 891 (1984).

Mr. Donahue requests a fee of $210 per hour, a figure set by the CLS attorney's fee committee. This amount is based upon Mr. Donahue's status as a supervisory attorney at CLS with approximately 16 years experience in public housing litigation. PHA objects to the award of this hourly rate since it alleges the hours were for tasks that were either unnecessary or could have been performed by a non-supervisory attorney or a paralegal. In support of this position, PHA cites the Honorable James McGirr Kelly's opinion in *Clark v. Philadelphia Housing Auth.,* 1994 WL 220022, 1994 U.S. Dist.Lexis 6870 (E.D.Pa., filed May 25, 1994), *appeal docketed,* No. 94–1626 (3d Cir. June 17, 1994).

In *Clark,* Judge Kelly awarded Mr. Donahue $150 an hour because the case was "a routine case involving no difficult or novel issues." *Id.* at *2, 1994 U.S.Dist. Lexis at *3. Judge Kelly found a less senior attorney could have carried out the tasks performed by Mr. Donahue. The Court noted that the current CLS Fees Schedule provides the following rates: (1) attorneys with 0–2 years experience have billing rates ranging from $90 to $120 per hour; (2) attorneys with 2–5 years experience have a rate from $120 to $160 per hour; and (3) attorneys with 6–10 years experience have a range of rates from $150 to $200 per hour. Based on CLS' schedule, Judge Kelly found $150 to be a reasonable rate for the tasks performed by Mr. Donahue.

The Third Circuit has affirmed the award of reduced hourly rates for experienced attorney's services when the work on the case could have been performed by an associate-

---

8. As part of the motion to enforce settlement, the plaintiff also alleged that PHA failed to transfer the family to another unit which was wheelchair accessible. This provision of the first settlement agreement was mooted by the time the motion to enforce settlement was filed. Before March 4, 1994, both parties agreed that Priscilla Jackson would remain in her existing unit with modifications to be made to accommodate her disabilities. (See Accessibility Plan dated 2/28/94; Answer to Motion to Enforce Settlement ¶ 3(i); N.T. 6/13/94, 56; 2/16/94 time entry reflecting conversation between Donahue and Fahringer about 504 inspection and plans).

level attorney. In *Ursic v. Bethlehem Mines*, 719 F.2d 670 (3d Cir.1983) the Court expressed its disapproval of "the wasteful use of highly skilled and highly priced talent for matters easily delegable to non-professionals or less experienced associates." The Court stated that "[r]outine tasks, if performed by senior partners in large firms, should not be billed at their usual rates. A Michelangelo should not charge Sistine Chapel rates for painting a farmer's barn." *Id.* at 677. Similarly, in *In re Fine Paper Antitrust Litigation*, 751 F.2d 562 (3d Cir.1984), the Court found no abuse of discretion when Judge McGlynn awarded reduced rates for partners' services that represented associate-level work. *Id.* at 591–93, 599. Likewise, in *Daggett v. Kimmelman*, 811 F.2d 793 (3d Cir.1987), the Court found the trial court did not abuse its discretion in reducing an attorney's hourly rate from $300 to $250, even though the attorney established that his historic hourly rate was $300. The Court stated that "there ... comes a point where a lawyer's historic rate, which private clients are willing to pay, cannot be imposed on his or her adversaries." *Id.* at 799. More recently, in *In re Busy Beaver Building Centers, Inc.*, 19 F.3d 833 (3d Cir.1994), a bankruptcy case, the Third Circuit noted that "[a] run-of-the-mill bankruptcy case does not warrant the lofty fees of nationally-renowned law firms.... In other words, the reasonable hourly rate has a cap based on the expected and actual complexity of the case." *Id.* at 855 n. 35 (citations omitted).

This Court is persuaded by Judge Kelly's reasoning in *Clark* which is supported by Third Circuit precedent. Judge Kelly's decision to reduce Mr. Donahue's hourly rate also is in harmony with Circuit Judge Aldrich's ruling that "a civil rights plaintiff is not entitled to recover a fee for a particularly expensive lawyer at his usual rates if plaintiff's suit does not require such special qualifications." *Furtado v. Bishop*, 84 F.R.D. 671, 676 n. 9 (D.Mass.1979) (Aldrich, C.J., sitting by designation).

Given the facts of this case, I conclude that Mr. Donahue should only be awarded $150 per hour for the time he spent on this case. This was not a factually or legally complex case. It involved no novel legal issues, and no extensive trial work. Indeed, no discovery was taken, with the exception of one set of interrogatories and request for documents. The case initially settled within 40 days of the filing of the Complaint, and concluded shortly after a motion to enforce the settlement was filed. The benefit of the lawsuit to the plaintiff was to cause PHA to hasten to do what it admitted it was required to do. A persistent lawyer was needed to keep PHA's feet to the fire, and Mr. Donahue ably filled that role. Nonetheless, this task did not require the assignment of a supervisory lawyer billing $210 per hour. This case was more suitable for a lawyer with two to five years experience. Therefore, based on CLS' fee schedule, the Court will award $150.00 per hour, which is reasonable.

### 3. *Lodestar*

Accordingly, I find the lodestar amount to be $3,285.. The Court has considered, but declines to make either an upward or downward adjustment to the lodestar. *See Hensley v. Eckerhart*, 461 U.S. 424, 434, 103 S.Ct. 1933, 1939–40, 76 L.Ed.2d 40 (1983). Any possible basis for such an adjustment has been reflected in the lodestar. Thus, no adjustment to the lodestar should be made. *See Cooper v. Utah*, 894 F.2d 1169, 1172 (10th Cir.1990); *Hughes v. Repko*, 578 F.2d 483, 487 (3d Cir.1978).

### IV. *SUPPLEMENTAL FEE PETITION*

Approximately one month after the evidentiary hearing held on June 13, 1994, CLS filed a Supplemental Motion For Attorney Fees, requesting an additional $4,791.00 in fees for time expended by Michael Donahue, Esquire and another supervisory attorney, George G. Gould, Esquire, during the hearing to determine counsel fees. The hearing lasted approximately five (5) hours. The amount requested approaches the $5,103 in attorney fees requested for litigating the merits of the case. Specifically, Mr. Donahue requests compensation for 14.6 hours at the rate of $210.00 per hour. Mr. Gould requests remuneration for 7.5 hours at the rate of $230.00 an hour.

 An attorney who is successful in obtaining an attorney fee award is entitled to compensation for the time he spent preparing a fee petition and litigating the same, "to the extent such time is *reasonably* necessary to obtaining a reasonable fee award." *Shadis v. Beal*, 703 F.2d 71, 73 (3d Cir.1983); *Bagby v. Beal*, 606 F.2d 411, 416 (3d Cir. 1979). However, a court should not award fees if the need for the fee litigation could have been avoided. *Action on Smoking and Health v. Civil Aeronautics Bd.*, 724 F.2d 211, 224 (D.C.Cir.1984).

The evidentiary hearing was devoted almost entirely to the issue of whether CLS should be denied fees because of its failure to exhaust administrative remedies and to communicate its client's problems to PHA management before filing the lawsuit. This Court has ruled that, while the plaintiff was not required to exhaust her administrative remedies, CLS should have made some pre-litigation effort to allow PHA the opportunity to satisfy the plaintiff's complaints. Thus, as a result of the hearing PHA's position was partially vindicated. Although the Court has awarded fees to CLS' attorneys, this was only because the Court found that unusual circumstances existed in this case.

It is clear to the Court that the evidentiary hearing could have been avoided, if CLS did what it should have done in the first place—attempt to solve its client's problems without litigation. In enacting the Civil Rights Attorney's Fee Awards Act of 1976, Congress gave broad discretion to the district court "to allow it to take into account equitable considerations." *Durett v. Cohen*, 790 F.2d 360, 363 (3d Cir.1986). This Court concludes that it would be unjust to award CLS fees for all of the 22.1 hours it claims it devoted to the evidentiary hearing because the hearing could have been easily avoided.

However, not all of the issues at the evidentiary hearing centered on CLS' efforts to resolve this case prior to filing suit. Some of the fee litigation concerned the reasonableness of certain hours spent by Mr. Donahue on this case. CLS was not entirely successful on all these issues. For example, Mr. Donahue did not receive compensation for work on the wheelchair accessibility plans

and was not awarded the requested hourly rate of $210.00. Fees should not be awarded for unsuccessfully defending this time and hourly rate. *See Prandini v. National Tea Co.*, 585 F.2d 47, 53, 54 n. 8 (3d Cir.1978) (to be entitled to fees for litigating fee petition, fee petitioner must be successful in fee litigation). On the other hand, after considering Mr. Donahue's testimony, I found his other hours to be compensable, *see* pp. 474–475 *supra*. Thus, CLS should be awarded fees for some of the time spent at the fee hearing.

In view of the mixed success CLS had as a result of the evidentiary hearing, and the fact that much of the hearing could have been avoided, the Court will award fees to CLS for only fifty percent (50%) of its claimed 22.1 hours; that is, a total of eleven (11) hours. This is an equitable adjustment since the Court awarded reduced fees for the work on the merits of the case. *See Durett v. Cohen, supra* at 363 (fees for work on fee petition should be reduced to reflect reduction of the fees for work on the merits); *Institutionalized Juveniles v. Secretary of Pub. Welfare*, 758 F.2d 897, 925 (3d Cir.1985) (affirming 12.5% reduction in award for work on fee request because only partial success was achieved); *Action on Smoking and Health v. Civil Aeronautics Bd., supra* at 224 (affirming 50% reduction in hours claimed for work on fee request to adjust for unnecessary expenditure of time). Furthermore, eleven (11) hours for fee litigation is more in proportion to hours spent on the main case. *See Coulter v. Tennessee*, 805 F.2d 146, 151 (6th Cir.1986) *cert. denied*, 482 U.S. 914, 107 S.Ct. 3186, 96 L.Ed.2d 674 (1987) (hours allowed for litigating an attorney fee case should not exceed three percent (3%) of the hours in the main case).

 The Court will only award an hourly rate of $150 to Messrs. Donahue and Gould for time spent litigating the fee petition. This is the rate the Court awarded for time spent on the merits of the case. Work justifying the fee petition does not require any greater legal skills. *See Richerson v. Jones*, 506 F.Supp. 1259, 1265 (E.D.Pa.1981). The Court also does not see any reason why it should award a higher hourly rate to Mr. Gould than awarded to Mr. Donahue since,

based on the affidavits submitted, both are of comparable skill and experience. Mr. Gould's primary duty was to present Mr. Donahue as a witness at the hearing. This task does not justify a higher hourly rate than awarded to Mr. Donahue. For all the above reasons, the Court awards fees of $1650.00 to CLS for hours expended litigating the fee petition.

## V. CONCLUSION

For all the above reasons, the Court awards the Community Legal Services attorney fees in the amount of $4,935.00 ($3,285.00 plus $1,650.00).