Andresia DIGGS, et al.

v.

**THE HOUSING AUTHORITY OF THE CITY OF FREDERICK, et al.**

No. CIV. CCB–98–1605.

United States District Court,
D. Maryland.

July 15, 1999.

Daniel F. Goldstein, Lauren E. Willis, Brown, Goldstein & Levy, Deborah M. Thompson, Public Justice Center, Inc., Baltimore, MD, Debra Gardner, Legal Aid Bureau, Inc., Daniel Q. Mahone, Frederick, MD, for Plaintiffs.

Shirlie Norris Lake, Hamilton Tyler, Eccleston & Wolf, Baltimore, MD, Alexander Francuzenko, Kevin J. O'Connell, O'Connell & O'Connell, Rockville, MD, Steven R. Becker, Pamela A. Bresnahan, Vorys, Sater, Seymour & Pease, Washington, DC, Heather Mulloy, John M. Quinn, Quinn, McAuliffe, Rowan & Falconer, Rockville, MD, for Defendants.

## *MEMORANDUM*

BLAKE, District Judge.

Numerous motions are pending in this case challenging enforcement of an allegedly unconstitutional trespass policy in several Frederick City public housing communities. Most pressing are the plaintiffs' motion for preliminary injunction, which has been fully heard, and their more re-

cent motion to amend the complaint to add an additional resident plaintiff.[1] Necessary to the disposition of the preliminary injunction motion, in this court's view, is a ruling on the defendants' motion to dismiss the plaintiffs' claims under the United States Housing Act, 42 U.S.C. § 1437 *et seq.* ("Housing Act").[2] Following a factual summary of the most pertinent evidence produced at the hearing held on December 28–29, 1998, these issues will be addressed in turn.

### Facts

The plaintiffs are residents and guests of residents of various properties owned by the Housing Authority of the City of Frederick ("the Authority"). The properties include the Taney Apartments, the John Hanson Apartments, the Carver Apartments, the Sagner Apartments, the Lincoln Apartments, and the Catoctin View Apartments (collectively, "the Apartments").

In 1992, in response to a perceived problem of drug dealing in and around the Apartments, the Authority through its then Executive Director Charlie H. Smith, Jr., by letter dated December 2, 1992, authorized the Frederick City Police Department "to act as the agent for the Housing Authority of the City of Frederick in connection with the enforcement of any and all trespass violations." (Deft. Auth.Ex. 11).[3] As explained in a February 1993 letter to the federal Department of Housing and Urban Development:

> [C]itations ... are being issued by the Frederick Police Department to non-residents who loiter in our public housing communities. The tickets were the idea

of our Community Police Patrol officers, and were developed in cooperation with Housing Authority and City of Frederick attorneys, representatives from the Office of the States Attorney, members of the Frederick Police Department and the Housing Authority. These citations were developed to enable the Frederick Police to enforce the laws against trespass. All members of the Frederick Police Department issue these citations; *if a person who has been issued a citation is witnessed again in the same community, they [sic] are considered to have been warned and can be arrested for trespassing without further warning.*

(Deft.Auth.Ex. 13) (emphasis added). The authorization given to the Police Department was reconfirmed by Resolution No. 368 issued by the Authority on July 7, 1994. (Deft. Police Ex. 9).

A newsletter issued in June 1994 by Mr. Smith and a memorandum issued in June 1997 by Teresa Ham, who became executive director of the Authority in approximately 1994, advised residents to carry their photo identification cards with them at all times to display to police or security officers if they are questioned about their residence in one of the Apartments. (Deft. Auth. Ex. 14; Pltf. Ex. 39, 40). Persons believed to be at one of the Apartments with "no apparent legitimate reason" (Pltf.Ex. 173, Int. No. 5) are issued citations warning them that they will be arrested and charged with criminal trespass if they return. (Pltf.Ex. 2, 4). As authorization for this policy, the Authority and the Police Department relied on Md. Ann.Code Art. 27, § 577, which was amended in 1994 to provide that:

---

1. The current plaintiffs are Justo Montanez, Jason Diggs, and Angel Holliday, visitors to the properties (hereinafter "guest plaintiffs"), and Kizzy and Andresia Diggs, former tenants of Housing Authority property (hereinafter "resident plaintiffs").

2. The Housing Act claims are contained in Count V of the complaint. The defendant Housing Authority filed a motion to dismiss Counts V, VI (in part), and VII; all other

defendants (except Watkins Security) joined in the motion to dismiss Count V. The motion to dismiss as to Counts VI and VII will be addressed by a separate Memorandum and Order.

3. A similar letter was sent by Mr. Smith to Chief of Police Major Regis Raffensberger on July 15, 1993. (Deft.Auth.Ex. 12).

(1) Any person who remains upon, enters upon or crosses over the land, premises or private property ... of any person or persons in this State after having been duly notified by the owner or his agent not to do so is considered guilty of a misdemeanor, and on conviction is subject to a fine not exceeding $500.00, or imprisonment not exceeding three months, or both.

(2) The provisions of Paragraph (1) of this subsection shall apply to property used as a housing project and operated by a housing authority or by another State public body, as those terms are defined under Article 44A of the Code, if a duly authorized agent of the housing authority or other State public body gives the required notification specified in paragraph (1) of this subsection.

(3) This section may not be construed to include within its provisions the entry upon or crossing over any land when such entry or crossing is done under a bona fide claim of right or ownership of said land, it being the intention of this section only to prohibit any wanton trespass upon private land of others.[4]

To keep a record of persons who have been warned, the Authority maintains a "trespass log" containing the names of everyone who has been issued a citation, along with the date on which the citation was issued and the Apartment complex which was involved. Significantly, once a person has been placed on the trespass log, he or she remains subject to arrest and prosecution for criminal trespass if he or she returns to the particular Apartment complex where the citation occurred *for any purpose*, including visiting a resident of the Apartment. (Pltf. Ex. 121, 122, 124; Trans. 12/28/98, p. 48).[5] The log now contains approximately 1,000 names.[6] (Pltf.Ex. 180, 217). Once on the log, a person's name remains there indefinitely. (Pltf.Ex. 124). There apparently is no established mechanism for informing tenants generally about the identity of the persons who have been placed on the trespass log, although "individual residents have been sent letters advising them that certain individuals have been warned not to trespass and that said individuals were not to return to the property, even at [the residents'] invitation." (Pltf.Ex. 173, Int. No. 8).

On May 15, 1997, by Resolution No. 425, and under a contract for the provision of security services, the Authority authorized Watkins Security Agency, Inc., as its agent to enforce the trespass laws. (Pltf.Ex. 37, 39, 138). The contract was discontinued in 1998, and Watkins is no longer providing security services at the Apartments.

Testimony and documents received at the hearing established that the "policy" itself is not contained in a single written

---

4. Section 577 was amended again in 1998. The substance, as well as most of the language, of the 1994 version remains intact.

5. A Housing Authority memorandum sent by current Executive Director Teresa Ham to all residents in 1997 informed residents:

> If a person has been warned not to trespass and you are aware that this is the case, first of all—*do not invite that person back to the property or allow them to visit you at your unit.* It is the position of the Housing Authority that doing so is helping or encouraging them to commit a crime—yes, trespassing is a crime. At times, it comes to my attention that someone who has been warned not to trespass continues to visit a particular resident. If that occurs, the Authority will send a letter to that resident advising them [sic] that the individual is [sic] has been warned *not to trespass.* The letter also advises the resident that *if the individual continues to come to the property at their invitation, the resident is subject to termination of the lease.*
> (Pltf.Ex. 121) (emphasis added).

6. Persons also were placed on the log and received a letter warning them to stay off all Authority property if they had been arrested on Authority property for "violent criminal activity or drug-related criminal activity." (Pltf.Ex. 44). They are identified on the log as having received "Letter All Comm[unities]." (Pltf.Ex. 180, 217). Approximately 95 persons are on the log for that reason. (Trans.12/29/98, p. 201).

document.[7] Moreover, its application and enforcement has changed to some extent over time. Not until March 1998, for example, were police officers advised to observe subjects "for a period of time" before stopping them, and to give suspected trespassers an opportunity to prove that they were visiting a resident. (Deft. Auth. Ex. 15; Trans. 12/28/98, p. 73). Nevertheless, the basic policy remains that persons whose names are placed on the trespass log are not allowed to return to the Apartment where they received the warning for any reason. (Pltf. Ex. 124; Trans. 12/29/98, p. 208; Trans. 12/28/98, p. 72).

At some point, the Authority adopted a procedure for residents to follow to have a potential visitor's name removed from the trespass log. As described in an April 1998 newsletter, the procedure is as follows:

> The resident who wants that person to visit may submit in writing a request to have the name removed from the trespassing log. Information that needs to be included in the request: name and current address of the person making the request and the person, date(s) of incident(s) of the trespassing charge(s), reason person feels it is necessary to visit the public housing community (specify which communities), indicate whether the trespassing charge was issued by the Frederick Police Department or Watkins Security, Inc., description of the incident(s) that resulted in a trespassing charge, and if the person was charged with trespassing more than once, explain the reason for the continuation of trespassing. Letters should be addressed to the Executive Director of the Housing Authority of the City of Frederick, 209 Madison Street, Frederick, MD 21701. After a letter is received at the Housing Authority office, a reply will be sent in writing stating the decision.

(Pltf.Ex. 124). Written notice of this procedure was not provided to public housing residents until March 1998. (Trans. 12/28/98, pp. 76, 85–86; Pltf. Ex. 149). The decision to remove a person's name from the trespass log is completely discretionary on the part of the Authority's Executive Director. There are no written standards or time deadlines governing her decision. (Trans.12/28/98, p. 86).

Numerous witnesses testified at the hearing on December 28–29, 1998, including Jamie Williams, a tenant at the John Hanson Apartments. Ms. Williams' brother, Richard Snowden, is on the log for a trespass warning issued May 15, 1997, at the Hanson Apartments. (Pltf.Ex. 217, p. HA0214).[8] As a tenant at the Hanson Apartments, Ms. Williams' ability to have

---

7. The description given in the Authority's answers to interrogatories was, in part
   If individuals are observed on Public Housing property, not in the company of a resident, with no apparent legitimate reason to be there, they are approached by the City of Frederick Police Department and asked if they have a legitimate reason to be on the property. If there is no legitimate reason, that individual is issued a written warning not to trespass in that particular Housing Authority community and his/her name is added to the Trespass Log maintained by the City of Frederick Police Department. Additionally, if an individual is arrested at one of the Public Housing communities for violent or drug-related criminal activity, that person may be issued a warning letter advising him or her not to trespass in any of the Public Housing communities, and his/

her name is added to the Trespass Log maintained by the City of Frederick Police Department. Whenever an individual is stopped by the City of Frederick Police Department, his or her name is checked against the Trespass Log.
   (Pltf.Ex. 173, Int. No. 5).

8. The father of one of Ms. Williams' children is also on the trespass log. It appears, however, that he is on the log because he was issued a letter on April 7, 1997, barring him from all the Apartments following a drug-related conviction for an incident that occurred on Authority property. (Deft. Auth. Ex. 1; Pltf. Ex. 217, p. HA0210). The Authority's right to bar people arrested for violent or drug-related activity on Authority property is not presently at issue.

guests is directly affected by the trespass policy.

In addition to testimony from guests and residents of the Apartments, the court heard from Chief of Police Raffensberger and other members of the Frederick City Police Department; the present and former executive directors of the Authority; and a representative of the neighboring community who led a petition drive supporting continuation of the trespass policy because in his opinion it has helped curb drug trafficking at the Apartments.[9] Chief of Police Raffensberger became Chief of Police for the City of Frederick in February 1992, after substantial experience enforcing narcotics laws in Baltimore City. He described numerous programs, in addition to the trespass policy, that he was responsible for developing to help fight the Frederick City drug problem.[10] He emphasized that the trespass policy is "a very valuable tool" in the city's law enforcement "arsenal." (Trans.12/29/98, p. 198). Regarding the actual implementation of the policy, Chief Raffensberger did not know how the concept of "legitimate" reason or purpose for being on Authority property had been articulated to the officers issuing warning citations, but he testified that "if a person could reasonably articulate why they were at a location where they didn't live and that reason could then be substantiated by corroboration from a relative and/or friend, that would be a legitimate reason." (*Id.*, p. 204). When asked specifically about the names on the trespass log, however, he agreed that some of the people whose names were on the log had in fact been visiting friends in public housing. (*Id.*, p. 202).[11]

### *The Motion to Amend the Complaint*

Hearings on the preliminary injunction motion were conducted in December 1998 and March 1999. The plaintiffs in the action at that time were Kizzy and Andresia Diggs, residents of the public housing authority, and several guests who were arrested for trespass at one of the housing authority properties while visiting residents. Another resident, who was not then named as a plaintiff, Jamie Williams, testified at the hearing regarding the impact that the trespass policy has in prohibiting visitors for her and her children. During the period of time that the hearings were conducted, Andresia and Kizzy Diggs were facing eviction proceedings in the state court. Prior to this court's issuance of an opinion on the preliminary injunction, the Diggs were evicted.

■ The plaintiffs now seek to amend the complaint to add Ms. Williams and her

---

9. Several present residents of the Apartments also testified in support of the policy, as they understood it. One resident indicated, however, that she would not support people getting arrested who were not involved in drug sales or other illegal activity but only happened to be on the property "not doing anything." (Trans.12/29/98, p. 178). Another thought that the policy was fair, so long as the police first checked with the resident to determine if the person stopped for trespassing really was visiting that resident. (Trans.12/28/98, p. 164).

10. As he stated:

We also developed the unit, Urban Neighborhood Involvement Team, neighborhood service officers and NSO program, skip program, school community involvement team. Block watch programs. Citizens advisory council, citizens patrol, Explorer Post, Auxiliary Post. A number of programs that are going on simultaneously. So there's no one program that can be attributed for the reduction of crime and/or narcotics used in the City of Frederick, but rather a conglomerate of programs that together have been proven very effective.

(Trans.12/29/98, p. 195–96). When asked during the hearing whether the trespass policy was the only method being used to combat the drug problem, the Authority's current Executive Director, Teresa Ham, answered: "No. Trespass, enforcement of trespassing is only one small part of that." (Trans.12/28/98, p. 93).

11. Moreover, Executive Director Ham testified that, in her judgment, on some occasions the police had enforced the trespass law in a way that "interferes with the tenant's right to have guests." (Trans.12/28/98, p. 44).

children as plaintiffs.[12] They also seek to have the court consider the pending preliminary injunction motion as it relates to Ms. Williams and her children, since it has become moot with respect to the Diggs.

With respect to the plaintiffs' request to amend the complaint, Federal Rule of Civil Procedure 15(a) directs that "leave [to amend] shall be freely given when justice so requires." Moreover, "[a]lthough the decision whether to grant leave rests within the sound discretion of the district court, the federal rules strongly favor granting leave to amend." *Medigen of Kentucky, Inc. v. Public Service Comm'n of West Virginia,* 985 F.2d 164, 167–68 (4th Cir.1993) (internal citation omitted). The leave sought should be given "[i]n the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc." *Id.* at 168 (quoting *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962)).

The defendants assert that the preliminary injunction motion is now moot as to the resident plaintiffs, Kizzy and Andresia Diggs, and that the court should not consider the proposed additional tenant plaintiffs for purposes of the preliminary injunction motion. Further, the defendants contend that permitting amendment of the complaint would impose undue prejudice on the defendants.

■■■ The defendants are correct that the plaintiffs, Andresia and Kizzy Diggs, no longer have standing to seek a preliminary injunction against the policy, as they no longer reside in public housing. *See City of Los Angeles v. Lyons,* 461 U.S. 95, 105, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983) (explaining that a plaintiff does not have standing to seek a preliminary injunction if

he is not likely to suffer future injury). Contrary to the defendants' protestations, however, the court retains subject matter jurisdiction over the case and is able to permit the addition of resident plaintiffs, Jamie Williams and her children, through an amended complaint. The defendants cite *Fox v. Board of Trustees of the State University of New York,* 42 F.3d 135 (2d Cir.1994), for the proposition that no additional plaintiffs may be joined in the case. *Fox,* however, is clearly distinguishable.

In *Fox,* student plaintiffs sought only injunctive relief against a university policy. By the time the case had been remanded following an appeal, the student plaintiffs had graduated. The court held that at the moment the students graduated, the case became moot because of the "absence of any remaining Plaintiffs with a legally cognizable personal interest in the outcome of the litigation." *Id.* at 137. As the case was moot, the court lacked subject matter jurisdiction and could not permit an amendment of the complaint to add current students as plaintiffs. *Id.* at 144. In contrast, this case is not moot. The guest plaintiffs retain a "legally cognizable personal interest" in, *inter alia,* the preliminary injunction motion, and Kizzy and Andresia Diggs retain an interest in their damages claims. Accordingly, the court is not prohibited from permitting the amendment on jurisdictional grounds.

Moreover, the defendants' claims regarding undue prejudice are not substantial. First, the defendants will be given an opportunity to conduct discovery prior to trial with respect to Ms. Williams' family's damages claims. Second, for purposes of the preliminary injunction motion, the defendants do not dispute the most important facts regarding Ms. Williams and her children: they have been residents of Frederick City public housing since July 1996, and their guests are subject to the Authority's trespass policy.

---

12. They also seek to add a new defendant, an individual police officer involved in enforcing

the trespass policy against a guest of Ms. Williams in April 1997.

The primary issue at the injunction hearing was the validity of the trespass policy under both the Housing Act and the United States Constitution. All of the evidence presented pertaining to the operation of the policy is relevant to Ms. Williams. The fact that Ms. Williams is a resident whose guests are deterred from visiting her due to the policy is sufficient to establish her claim with respect to the preliminary injunction, and the defendants are not prejudiced by failing to obtain discovery from her on additional issues prior to the hearing.[13] Any factual allegations in the amended complaint not reflected in the evidence presented at the hearing will not be considered for purposes of the preliminary injunction ruling.

Accordingly, given the court's continuing jurisdiction over this case despite the Diggs' loss of standing to seek injunctive relief, the absence of unfair prejudice to the defendants, and the strong preference for permitting amendments expressed in Fed.R.Civ.P. 15(a), the motion to amend will be granted.

### The Motion to Dismiss the Housing Act Claims

The Fourth Circuit recently summarized the basic principles governing the resolution of Rule 12(b)(6) motions:

> The purpose of a Rule 12(b)(6) motion is to test the sufficiency of a complaint; "importantly, [a Rule 12(b)(6) motion] does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Republican Party v. Martin,* 980 F.2d 943, 952 (4th Cir.1992). Accordingly, a Rule 12(b)(6) motion should only be granted if, after accepting all well-pleaded allegations in the plaintiff's complaint as true and drawing all reasonable factual inferences from those facts in the plaintiff's favor, it appears certain that the plaintiff cannot prove any set of facts in support of his claim entitling him to relief. *See*

*id.* . . . We do note, however, that for purposes of Rule 12(b)(6), we are not required to accept as true the legal conclusions set forth in a plaintiff's complaint. *See District 28, United Mine Workers of Am., Inc. v. Wellmore Coal Corp.,* 609 F.2d 1083,1085 (4th Cir.1979).

*Edwards v. City of Goldsboro,* 178 F.3d 231, 243 (4th Cir.1999).

In Count V of the complaint, all the plaintiffs assert a cause of action under 42 U.S.C. § 1983 for the Authority's alleged violations of the Housing Act. Specifically, the plaintiffs allege that the Authority's trespass policy violates the resident plaintiffs' rights under the Housing Act and its implementing regulations "to have guests in their homes." (Compl.¶ 108). The defendants seek dismissal of this claim on the grounds that the Housing Act does not provide a cause of action "for failure to permit guests who have violated a trespass policy to enter upon Housing Authority property." (Deft.Motion, p. 6).

Section 1983 imposes civil liability on anyone who, under color of state law, deprives a person "of any rights, privileges, or immunities secured by the Constitution and laws." This protection extends to rights conferred by federal statutes and their implementing regulations. *Blessing v. Freestone,* 520 U.S. 329, 340, 117 S.Ct. 1353, 137 L.Ed.2d 569 (1997); *see Wright v. City of Roanoke Redev. and Hous. Auth.,* 479 U.S. 418, 420 n. 3, 430, 107 S.Ct. 766, 93 L.Ed.2d 781 (1987) (holding that HUD regulation requiring public housing authorities to include reasonable utilities allowance in statutory rental payment conferred enforceable right within meaning of § 1983); *but see Smith v. Kirk,* 821 F.2d 980, 984 (4th Cir.1987) (explaining that an administrative regulation "cannot create an enforceable § 1983 interest not already implicit in the enforcing statute").

---

**13.** The defendants did have notice that she would be a witness at the hearing and were prepared to cross-examine her. (*See* Trans. 12/28/98, pp. 113–121).

A plaintiff may seek redress under § 1983 for a federal statutory violation so long as (1) the statute creates enforceable rights, privileges, or immunities within the meaning of § 1983, and (2) Congress has not foreclosed such enforcement of the statute. *Wright,* 479 U.S. at 423, 107 S.Ct. 766. Congress may foreclose a § 1983 remedy for a statutory violation either expressly in the statute itself or "by creating a comprehensive enforcement scheme that is incompatible with individual enforcement under § 1983." *Blessing,* 520 U.S. at 341, 117 S.Ct. 1353. In *Wright,* the Supreme Court found that Congress has not foreclosed individual suits under § 1983 for violations of the federal Housing Act. 479 U.S. at 424, 107 S.Ct. 766; *see also Blessing,* 520 U.S. at 347, 117 S.Ct. 1353. Thus, the question here is whether the Housing Act and its implementing regulations confer upon the resident plaintiffs a "right" to have guests visit them in the plaintiffs' public housing apartments.

To answer this question, the plaintiffs' complaint must be scrutinized to identify each particular statutory or regulatory provision which the plaintiffs claim gives rise to their asserted right to have guests. *See Blessing,* 520 U.S. at 346, 117 S.Ct. 1353. The Housing Act may not be analyzed as a generic whole. *See id.* at 342–45, 117 S.Ct. 1353 (criticizing lower court for "taking a blanket approach to determining whether [federal statute in issue] creates rights"). Once each provision allegedly violated is identified, it is then assessed considering three factors:

> First, Congress must have intended that the provision in question benefit the plaintiff. *Wright,* 479 U.S. at 430, 107 S.Ct. 766. Second, the plaintiff must demonstrate that the right assertedly protected by the statute is not so "vague and amorphous" that its enforcement would strain judicial competence. *Id.* at 431–432, 107 S.Ct. 766. Third, the statute must unambiguously impose a binding obligation on the States. In other words, the provision giving rise to the asserted right must be couched in mandatory rather than precatory terms. *Wilder v. Virginia Hosp. Assoc.,* 496 U.S. 498, 510–11, 110 S.Ct. 2510, 110 L.Ed.2d 455 (1990); *see also Pennhurst State School and Hosp. v. Halderman,* 451 U.S. 1, 17, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981) (discussing whether Congress created obligations giving rise to an implied cause of action).

*Blessing,* 520 U.S. at 340–41, 117 S.Ct. 1353 (internal citations altered).

In their complaint, the plaintiffs claim that the Authority's trespass policy violates both the Housing Act's statutory mandate that public housing leases not contain any "unreasonable terms and conditions," 42 U.S.C. § 1437d(l)(2), · and HUD's implementing regulation requiring that public housing leases "shall" provide for "reasonable accommodation" of tenants' guests, 24 C.F.R. § 966.4(d)(1).[14] The court believes that the regulatory requirement that the Housing Authority "reasonably accommodate" the resident plaintiffs' guests is not only a valid interpretation of the statute entitled to deference, *cf. Wright,* 479 U.S. at 430 & n. 11, 107 S.Ct. 766 (affirming § 1983 plaintiffs' reliance upon HUD regulation defining meaning of statutory term "rent" to include reasonable charge for utilities), but also is "implicit" within the statutory prohibition on "unreasonable" lease conditions, *see Smith,* 821 F.2d at 984, since it would be patently unreasonable to prohibit public housing tenants from entertaining guests. Furthermore, the court does not believe that this requirement is satisfied merely by the inclusion within the Housing Authority's standard lease of a term providing that "[g]uests or visitors of the Tenant and authorized houshold members may be accommodated for a period not to exceed two (2) weeks in any one calendar year." (Pltf.Ex. 49). On the contrary, the

---

**14.** Pursuant to 42 U.S.C. § 3535(d), the Secretary of HUD is authorized to "make such rules and regulations as may be necessary to carry out his functions, powers, and duties."

court finds that the regulation substantively prohibits public housing authorities from unreasonably interfering with tenants' ability to entertain guests in the tenants' public housing apartments. *Cf. Wilder v. Virginia Hosp. Ass'n,* 496 U.S. 498, 513–14, 110 S.Ct. 2510, 110 L.Ed.2d 455 (1990) (rejecting argument that former provision of Medicaid statute requiring states to make certain findings and assurances that reimbursement rates for health care providers were "reasonable and adequate" was procedural only and that findings and assurances need not be correct).

■■■■ Finally, applying the three factors summarized in *Blessing* to these two provisions, the court finds, first, that the resident plaintiffs clearly are within the class of persons whom Congress intended to benefit from these provisions. *Cf. Perry v. Housing Auth. of the City of Charleston,* 664 F.2d 1210, 1213 (4th Cir.1981) ("there is no question but that low income tenants were desired beneficiaries of this legislation") (citations omitted). Hence, the first factor is satisfied.[15] As for the second factor, the defendants contend that the regulation requiring "reasonable accommodation" for residents' guests is too "vague and amorphous" for effective interpretation and enforcement by the court. The court disagrees. Although the term "reasonable" implies that more than one guest policy is permissible, it is certainly within this court's competence to determine whether the trespass policy adopted by the Housing Authority in this case is unreasonable. *Cf. Simmons v. Charleston Hous. Auth.,* 881 F.Supp. 225, 230 n. 8 (S.D.W.Va.1995) (finding certain lead paint-related provisions in Housing Act and Lead–Based Paint Poisoning Prevention Act not unduly vague despite requirement that repairs to lead paint areas be completed within "reasonable period of time"). Finally, the use of the word "shall" in the regulation indicates that it is

mandatory rather than merely precatory. The court concludes, therefore, that a private cause of action under § 1983 is available for a violation of HUD regulation 24 C.F.R. § 966.4(d)(1). Accordingly, the defendants' motion to dismiss plaintiffs' Housing Act claim will be denied.

### *Motion for a Preliminary Injunction*

The Fourth Circuit summarized the law governing this court's disposition of a preliminary injunction motion in *Rum Creek Coal Sales, Inc. v. Caperton,* 926 F.2d 353, 359 (4th Cir.1991):

> The standard for preliminary injunctions is established in this Circuit by *Blackwelder Furniture Co. v. Seilig Mfg. Co.,* 550 F.2d 189 (4th Cir.1977). *Blackwelder* clarified that a hardship balancing test applies to determine the granting or denial of a preliminary injunction. *See L.J. By and Through Darr v. Massinga,* 838 F.2d 118 (4th Cir.1988), *cert. denied,* 488 U.S. 1018, 109 S.Ct. 816, 102 L.Ed.2d 805 (1989). Four factors must be considered:
>
> > (1) the likelihood of irreparable harm to the plaintiff if the preliminary injunction is denied,
> >
> > (2) the likelihood of harm to the defendant if the requested relief is granted,
> >
> > (3) the likelihood that the plaintiff will succeed on the merits, and
> >
> > (4) the public interest.
>
> *Massinga,* 838 F.2d at 120. The irreparable harm to the plaintiff and the harm to the defendant are the two most important factors.

The "[p]laintiff bears the burden of establishing that each of these factors supports granting the injunction." *Direx Israel, Ltd. v. Breakthrough Med. Corp.,* 952 F.2d 802, 812 (4th Cir.1991) (citations omitted). Generally, the court should first balance the relative likelihood of harm between the

---

**15.** This factor is not satisfied, however, with respect to the guest plaintiffs. Accordingly, the defendants' motion to dismiss Count V of the complaint will be granted with respect to the guest plaintiffs' claims under the Housing Act.

parties in order to establish how strong the plaintiff's showing of likelihood of success on the merits must be:

> If, after balancing those two factors [*i.e.*, irreparable harm to plaintiff against harm to the defendant], the balance 'tips decidedly' in favor of the plaintiff, a preliminary injunction will be granted if 'the plaintiff has raised questions going to the merits so serious, substantial, difficult, and doubtful as to make them fair ground for litigation and thus for more deliberate investigation.' As the balance tips away from the plaintiff, a stronger showing on the merits is required.

*Id.* at 812–13 (alterations in original) (quoting *Rum Creek Coal*, 926 F.2d at 359).

■ The resident plaintiffs,[16] Ms. Williams and her children, assert that they will suffer irreparable harm each day that their statutory right to reasonable access to their guests is infringed by the Housing Authority's trespass policy. In particular, Ms. Williams claims that the policy interferes with her ability to visit with her brother, Richard Snowden, who was placed on the trespass log in May 1997. The defendants counter that the policy is essential to maintaining order and excluding trespassers from the property.

The court finds that the trespass policy as currently enforced is a virtually permanent bar to a tenant's right to invite a guest into her own home, no matter how close a friend or relative that potential guest might be. Under the policy, all persons who have been issued a trespass citation, whether correctly or incorrectly, *see In re Jason Allen D.*, 127 Md.App. 456, 733 A.2d 351, 363, 368 (Md.Ct.Spec.App. 1999) (unofficial opinion subject to revision) (overturning conviction for criminal trespass pursuant to Authority's trespass policy where juvenile defendant on trespass log had been invited to property by cousin who lived in public housing), are indefinitely prohibited from returning to Housing Authority property even if a tenant personally escorts them from the public sidewalk into the tenant's own apartment. Furthermore, tenants have been told that they face eviction if they invite persons known to be on the trespass log into their homes. A tenant's only recourse if she wishes to receive such a guest is a burdensome appeal to the Authority's Executive Director who exercises unfettered discretion in her rulings. In light of these circumstances, the court finds that the harm caused by the trespass policy to Ms. Williams' and other tenants' right to have guests is substantial.

Against this substantial harm must be weighed the likelihood of harm to the defendants' law enforcement and community safety efforts if enforcement of the present policy is enjoined. At the outset, the court emphasizes that it in no way minimizes the seriousness of the drug trafficking problem facing the City of Frederick. Appropriate law enforcement efforts to curb this problem are essential. The evidence in this case demonstrates, however, that enforcement of the current trespass policy is only one aspect of ongoing community policing efforts. There is no evidence that the trespass policy in its present incarnation is the only effective drug– and crime–fighting measure available to local authorities[17] or even that it is the most effective.[18] Thus, the court finds that the defendants have not established that enjoining the trespass policy will cause a significant like-

---

**16.** Although the guest plaintiffs also move for the injunction, since the court will grant the injunction based upon an analysis of the rights claimed by the resident plaintiffs, it is not necessary to reach the guest plaintiffs' claims.

**17.** Maryland law, for example, permits a duly authorized agent of the housing authority to enforce the trespassing law by posting reasonably conspicuous signs. Md.Code Ann. Art. 27, § 577 (1998).

**18.** As Chief of Police Raffensberger testified at the preliminary injunction hearing: "[T]here's no one program that can be attributed for the reduction of crime and/or narcotics used in the City of Frederick ...." (Trans. 12/29/98, p 196).

lihood of harm to their ability to combat the drug problem either in the City of Frederick or on public housing property. Accordingly, I find that the balance of hardships "tips decidedly in favor of the plaintiffs." *See Direx Israel,* 952 F.2d at 812–13.

Turning now to the likelihood of success on the merits, the plaintiffs must show that they have raised questions on the merits that are "so serious, substantial, difficult, and doubtful as to make them fair ground for litigation and thus for more deliberate investigation." *Id.* This they have clearly done.

■ As noted above, the Housing Act and its implementing regulations require the defendants to provide "reasonable accommodation" for the resident plaintiffs' guests. (24 C.F.R. § 966.4(d)(1)). For the reasons discussed earlier, the current trespass policy impermissibly excludes many potential guests from the Apartments. While the defendants assert that the "delogging" procedure provides a reasonable alternative for any tenant who wishes to have a guest taken off the log, the plaintiffs have effectively argued that the burdensome and subjective nature of the "delogging" review by the Executive Director of the Housing Authority renders it an inherently unreasonable procedure. *Cf. Lancor v. Lebanon,* 760 F.2d 361, 363 (1st Cir.1985) (stating that "a [public housing authority's] regulation which requires a tenant to obtain the management's prior written approval of *every* overnight guest, and allows management unfettered discretion to approve or disapprove the tenant's request, strikes us as neither necessary nor reasonable"). Moreover, despite the Authority's recent "retraining" of police officers regarding when to place persons on the log initially, the existing log has not been purged and started anew, and the defendants do not deny that the log contains the names of individuals who may have been placed on the log even though they were actually on their way to visit a resident. The resident plaintiffs should not be burdened with the responsibility for removing such persons' names from the log.[19] Accordingly, the court finds that the resident plaintiffs have demonstrated a sufficient likelihood of success on the merits on this issue to meet the *Direx Israel* test.[20]

The final factor to be considered, the public interest, is largely subsumed in the court's earlier discussion of the relative likelihood of harm. Since the public's interest in curbing drugs will not be significantly harmed by enjoining the current trespass policy, and since that policy so strongly interferes with the resident plaintiffs' right to reasonable accommodation of their guests, the court finds that the public interest favors granting an injunction.

Based on the above analysis, the court will preliminarily enjoin the Housing Authority's continuation of the current trespass policy with respect to all persons,

---

**19.** The Maryland Court of Special Appeals' recent decision in *In re Jason Allen D., supra,* raises serious questions about the legality of relying on the trespass log as a basis for arresting persons found on public housing property. Furthermore, while it is not necessary to reach the constitutional issues, *see Hoffman v. Hunt,* 126 F.3d 575, 582 (4th Cir.1997) ("we need not reach the constitutional question if there exists an alternative, nonconstitutional basis for our decision"), the policy of issuing citations to persons with "no apparent legitimate reason" for being on Housing Authority property may raise serious due process concerns in light of the Supreme Court's recent decision in *Chicago v. Morales,* 527 U.S. 41, 119 S.Ct. 1849, 144 L.Ed.2d 67 (1999).

**20.** The resident plaintiffs' leases also provide that their guests and visitors "may be accommodated for a period not to exceed two (2) weeks in any one calendar year." (Pltf.Ex. 49). The resident plaintiffs contend that the Authority's trespass policy infringes on their contractual right to have guests granted by this provision. For essentially the same reasons as set forth in the court's analysis of the Housing Act claim, the court finds that the resident plaintiffs have demonstrated a substantial likelihood of success on their breach of contract claim. (Compl. Count VI).

except for those placed on the trespass log as a result of having received a "Letter All Comm[unities]." *See* footnote 5, *supra.*

A separate Order follows.

### ORDER

For the reasons stated in the accompanying Memorandum, it is hereby **ordered** that:

1.  the plaintiffs' motion to amend the complaint is **GRANTED**;

2.  the defendants' motion to dismiss Count V of the complaint is **GRANTED** as to the guest plaintiffs and **DENIED** as to the resident plaintiffs;

3.  the plaintiffs' motion for a preliminary injunction is **GRANTED**;

4.  the defendants are **PRELIMINARILY ENJOINED** from continuing the current trespass policy with respect to all persons, except for those placed on the trespass log as a result of violent or drug-related activity occurring on Housing Authority property; and

5.  copies of this Order and the accompanying Memorandum shall be mailed to counsel of record.